Brian Litmans (AK Bar No. 0111068)
Austin Williams (AK Bar No. 0911067)
Victoria Clark (AK Bar No. 0401001)
Trustees for Alaska
1026 W. Fourth Avenue, Suite. 201
Anchorage, AK 99501
(907) 276-4244
Fax (907) 276-7110
blitmans@trustees.org
awilliams@trustees.org
vclark@trustees.org

Aaron Isherwood, *Pro Hac Vice*
Peter Morgan, *Pro Hac Vice*
Sierra Club Environmental Law Program
85 Second Street, 2d Floor
San Francisco, CA 94105-3441
(415) 977-5680
Fax: (415) 977-5793
aaron.isherwood@sierraclub.org
peter.morgan@sierraclub.org

Attorneys for Plaintiffs

## THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| ALASKA COMMUNITY ACTION ON TOXICS, *et al.*, | ) ) ) | Case No.  3:09-CV-00255-TMB |
| Plaintiffs, | ) ) | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** |
| v. | ) ) | |
| AURORA ENERGY SERVICES, LLC, *et al.*, | ) ) | |
| Defendants. | ) ) | |

TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. ii

TABLE OF AUTHORITIES........................................................................................................iii

I.      INTRODUCTION ......................................................................................................... 1

II.     STANDARD OF REVIEW ........................................................................................... 1

III.    LEGAL FRAMEWORK OF THE CLEAN WATER ACT ............................................. 2

IV.     STATEMENT OF MATERIAL FACTS .......................................................................... 4

V.      ARGUMENT .................................................................................................................. 6

        A.      The Stormwater General Permit Does Not Shield AES From Liability For Non-
                Stormwater Discharges. ........................................................................................ 8

        B.      ACAT Properly Brought this Citizen Suit Under the Act, and was Not Required to First
                Petition EPA to Require an Individual NPDES Permit. ................................. 12

        C.      Citizen Suits For Violations of Section 402 of the Act Are Not Precluded. ................. 15

        D.      ACAT's Citizen Suit In No Way Undermines the Intent of the CWA........................... 15

        E.      The Coal Stockpile, Stacker/Reclaimer, Railcar Dumping Facility, Ship Loader and
                Conveyor Systems Are All Point Sources for Coal Discharges. .................................... 16

        F.      Plowing Coal-Contaminated Snow Directly Into Waters of the U.S. Is Not a Discharge
                Covered Under the Stormwater General Permit. ........................................................... 23

        G.      Failure to Obtain an NPDES Permit Is an Ongoing Violation of the CWA.................. 24

VI.     CONCLUSION................................................................................................................ 24

CERTIFICATE OF SERVICE ................................................................................................... 27

TABLE OF AUTHORITIES

**Statutes**

33 U.S.C. § 1251(a) ........................................................................................................ 2

33 U.S.C. § 1251(a)(1)-(3) ............................................................................................. 2

33 U.S.C. § 1311(a) ................................................................................... 1-2, 4, 8, 15, 25

33 U.S.C. § 1319(d) ...................................................................................................... 16

33 U.S.C. § 1319(g)(6) ................................................................................................... 4

33 U.S.C. § 1342 .......................................................................................................... 15

33 U.S.C. § 1342(k) ........................................................................................................ 7

33 U.S.C. § 1362(6) ........................................................................................................ 3

33 U.S.C. § 1362(7) ........................................................................................................ 3

33 U.S.C. § 1362(12) ..................................................................................................... 17

33 U.S.C. § 1362(14) .............................................................................................. 4, 17-18

33 U.S.C. § 1365(a) ......................................................................................... 8, 15, 25

33 U.S.C. § 1365(b) ...................................................................................................... 13

33 U.S.C. § 1365(b)(1)(A) .............................................................................................. 4

33 U.S.C. § 1365(b)(1)(B) .............................................................................................. 4

33 U.S.C. § 1365(f) ............................................................................................... 15, 25

**Regulations**

40 C.F.R. § 122.2 ........................................................................................................ 3-4

40 C.F.R. § 122.26 .......................................................................................................... 5

40 C.F.R. § 122.26(b)(13) ......................................................................................... 5, 24

40 C.F.R. § 122.26(b)(14) ............................................................................................... 5

40 C.F.R. § 122.28 .......................................................................................................... 5

40 C.F.R. § 122.28(b)(3)(i) ........................................................................................... 14

## Cases

*Amigos Bravos v. Molycorp, Inc.*, No. 97-2327, 1998 WL 792159
    (10th Cir. Nov. 13, 1998)................................................................................. 14

*Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937 (2009) ................................................ 2

*Atl. States Legal Found., Inc. v. Eastman Kodak Co.*, 12 F.3d 353 (2d Cir. 1993)................. 8-10

*Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897 (5th Cir.1983)............................... 24

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................ 2

*Carr v. Alta Verde Industries, Inc.*, 931 F.2d 1055 (5th Cir. 1991)............................................. 25

*Catskill Mts. Chapter of Trout Unlimited, Inc. v. City of New York*,
    273 F.3d 481 (2d Cir. 2001)............................................................................ 3

*Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*,
    890 F.2d 690 (4th Cir. 1989) ......................................................................... 25

*Concerned Area Residents for Environment v. Southview Farm*,
    34 F.3d 114 (2d Cir. 1994) ............................................................................ 20

*Consolidated Coal v. Costle*, 604 F.2d 239 (4th Cir. 1979) ........................................... 19

*Coon ex rel. Coon v. Willet Dairy, LP*, 536 F.3d 171 (2d Cir. 2008) ............................... 9

*Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199 (2d Cir. 2009)................................ 18, 20, 23

*E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112 (1977)...................................... 8

*Friends of Santa Fe County v. LAC Minerals, Inc.*, 892 F. Supp. 1333 (D.N.M. 1995)............. 19

*General Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational
    Church*, 887 F.2d 228 (9th Cir. 1989) ............................................................. 2

*Gwaltney of Smithfield v. Chesapeake Bay Foundation*, 484 U.S. 49 (1987) ....................... 16

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ........................................................ 2

*Knee Deep Cattle Co., Inc. v. Bindana Inv. Co. Ltd.* 94 F.3d 514 (9th Cir. 1996)................... 16

*League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181 (9th Cir. 2002)................. 18, 21-22

*Legal Envtl. Assistance Found. v. Hodel*, 586 G. Supp. 1163 (E.D. Tenn. 1984)................... 13

*Long Island Soundkeeper Fund, Inc. v. New York Athletic Club of City of New York*,
    1996 WL 131863 (S.D.N.Y. March 22, 1996) ................................................ 22

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION                     Page iv
TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
*Alaska Community Action on Toxics, et al. v. Aurora Energy Services, et al.*
Case No. 3:09-CV-00255-TMB

*McGlinchy v. Shell Chemical Co.*, 845 F.2d 802 (9th Cir. 1988)......................................... 2

*Nat'l Wildlife Fed'n v. Gorsuch,* 693 F.2d 156 (D.C. Cir. 1982) .................................... 3

*New.Net, Inc. v. Lavasoft*, 356 F.Supp.2d 1090 (C.D. Cal. 2004).................................. 1

*No Spray Coalition v. City of New York*, 2005 WL 1354041 (S.D.N.Y. June 8, 2005) ......... 21-22

*Ohio Valley Environmental Coalition v. Apogee Coal Co., LLC*,
    531 F. Supp. 2d 747 (S.D. W.Va. 2008)................................................... 13-14

*Oregon Natural Desert Ass'n v. Dombeck*, 172 F.3d 1092 (9th Cir. 1998)........................ 17-18

*Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993 (11th Cir. 2004)....................... 19

*Peconic Baykeeper, Inc. v. Suffolk County*, 600 F.3d 180 (2d. Cir. 2010) ................... 21-22

*Piney Run Preservation Assoc. v. County Commissioners of Carrol County, Maryland*,
    268 F.3d 255 (4th Cir. 2001) ................................................................. 9-10, 12

*Romero-Barcelo v. Brown*, 478 F. Supp. 646 (D.P.R. 1979), *rev'd on other grounds*, 643 F.2d
    835 (1st Cir. 1981), *aff'd sub nom.*, *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) .. 22

*Rybachek v. EPA*, 904 F.2d 1276 (9th Cir. 1990)......................................... 3

*San Francisco Baykeeper v. Cargill Salt Div.*, 481 F.3d 700 (9th Cir. 2007) ................ 2

*Sierra Club v. Abston Constr. Co., Inc.*, 620 F.2d 41 (5th Cir. 1980) ......................... 19

*Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133 (10th Cir. 2005) ...................... 3-4, 15

*Stone v. Naperville Park Dist.*, 38 F. Supp. 2d 651 (N.D. Ill. 1999) ....................... 20, 22

*Trustees for Alaska v. EPA*, 749 F.2d 549 (9th Cir. 1984) ......................... 18

*United States v. Earth Sciences, Inc.*, 599 F.2d 368 (10th Cir. 1979) ........................ 18

*United States v. Oxford Royal Mushroom Prods., Inc.*, 487 F. Supp. 852 (E.D. Pa. 1980) ......... 20

*United States v. Tull*, 615 F. Supp. 610 (E.D. Va.1983)................................... 24

*United States v. Weisman*, 489 F. Supp. 1331 (M.D. Fla.1980)............................. 24

**Other Authorities**

S. Rep. No. 92-414 (1972) ................................................................. 3

I.       **INTRODUCTION**

The fundamental premise of the Federal Water Pollution Control Act, (hereinafter

"CWA" or "the Act") is that "the discharge of any pollutant by any person shall be unlawful,"

except as otherwise permitted under the Act.  33 U.S.C. § 1311(a).  Plaintiffs Alaska Community

Action on Toxics and the Alaska Chapter of the Sierra Club (collectively "ACAT") bring this

CWA enforcement action against Defendants Aurora Energy Services, LLC ("AES") and Alaska

Railroad Corporation ("ARRC") to stop their illegal, unpermitted discharges of coal, coal slurry,

coal-contaminated snow, coal dust, and coal debris into Resurrection Bay ("the Bay").

Complaint (Docket 1) at ¶¶ 1, 48-75.

Defendants' Motion for Judgment on the Pleadings ("Motion") (Docket 40) claims that:

(1) AES's coverage under the *General Permit for Stormwater Discharges Associated With*

*Industrial Activity*[1] (hereinafter "Stormwater General Permit") provides a permit shield against

liability for non-stormwater discharges; (2) ACAT did not exhaust administrative remedies; (3)

the Seward Coal Loading Facility ("SCLF"), including the stacker-reclaimer, coal stockpiles,

railcar dumping facility, ship loader and the conveyor systems are not point sources that

discharge coal dust into Resurrection Bay; (4) Congress did not intend to regulate airborne

conveyances of pollutants from point sources into waters of the U.S.; and (5) discharges of coal-

contaminated snow directly into the Bay is covered under the Stormwater General Permit.  None

of these claims has merit, as discussed below, and Defendants' Motion should be denied.

II.      **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(c) is a vehicle for summary adjudication, but the

standard is like that of a motion to dismiss.  *New.Net, Inc. v. Lavasoft*, 356 F.Supp.2d 1090,

---

[1] While Defendants rely heavily upon the requirements of the Stormwater General Permit as a
defense, they only include one citation to the url link for the document itself.  See Motion at 17, n. 88.  While
Defendants refer continuously to the General Permit starting at page 4 of their Motion, they do not provide an
actual or direct citation to any of the Permit's provisions.  A copy of the Stormwater General Permit is
provided as Ex. 1 (*see also* Final National Pollutant Discharge Elimination System (NPDES) General Permit
for Stormwater Discharges From Industrial Activities, 73 Fed. Reg. 56572 (Sept. 28, 2008).  Additionally, a
copy of the Multi-Sector General Permit Fact Sheet ("MSGP Fact Sheet") is attached as Ex. 2.

1115-1116 (C.D. Cal. 2004) *citing Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). The U.S. Supreme Court recently set out that the "plausibility" standard established in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), constitutes "the pleading standard for all civil actions." *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1953 (2009). The *Twombly* plausibility standard requires that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

In ruling on a motion for judgment on the pleadings, the court must construe the complaint, and resolve all doubts, in the light most favorable to the plaintiff. *General Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989). Although the court must accept all material allegations in the complaint as true, the court need not accept as true conclusory allegations or legal characterizations. *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 810 (9th Cir. 1988).

## III. LEGAL FRAMEWORK OF THE CLEAN WATER ACT

In 1972, Congress enacted the CWA with the explicit objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In order to achieve this objective, Congress established certain goals, including: (1) to eliminate the discharge of pollutants into the navigable waters by 1985; (2) to attain water quality which can provide for the protection and propagation of fish, shellfish, and wildlife and provide for recreation both in and on the water by July 1, 1983; and (3) to prohibit the discharge of toxic pollutants in toxic amounts. 33 U.S.C. § 1251(a)(1)-(3). To achieve these ends, "[o]ne of [the Act's] principal provisions prohibits the unpermitted discharge of pollutants into 'navigable waters.'" 33 U.S.C. § 1311(a). *San Francisco Baykeeper v. Cargill Salt Div.*, 481 F.3d 700, 704 (9th Cir. 2007).

Specifically, the Act prohibits the discharge of any pollutant from a point source unless

authorized by a permit issued under the National Pollutant Discharge Elimination System ("NPDES") permit program. 33 U.S.C. §§ 1311(a), 1342.  To establish a violation of the prohibition against unpermitted discharges, a plaintiff must prove that the defendant (1) discharged (2) a pollutant (3) into navigable waters (4) from a point source (5) without a permit. *Sierra Club v. El Paso Gold Mines, Inc*., 421 F.3d 1133, 1141-42 (10th Cir. 2005) citing *Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 165 (D.C. Cir. 1982).

Under the Act, the "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  An "addition" is the introduction of a pollutant into navigable water.  *See Catskill Mts. Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 491 (2d Cir. 2001); *see also Rybachek v. EPA*, 904 F.2d 1276, 1285 (9th Cir. 1990) (upholding the EPA's interpretation of "addition" to include re-depositing material from the streambed into the stream as well as depositing material from outside the stream).

The Act defines "pollutant" as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."  33 U.S.C. § 1362(6); *see also* 40 C.F.R. § 122.2.  The legislative history clearly demonstrates that "pollutant" is to be broadly interpreted.  S. Rep. No. 92-414, at 76 (1972).[2]

The Act defines "navigable waters" as "waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  The EPA has further defined "the waters of the United States" to include "all waters which are currently used, were used in the past, or may be

---

[2] *See also* Rodgers, William H., Jr. *Environmental Law: Air and Water.* 2 vols. St Paul, Minnesota: West Publishing Co., 1986 at 144 ("This laundry list of 'bads' endorses an understanding of a pollutant as a 'resource out of place.'  The congressional purpose was to identify and anticipate all of the physical 'stuff' that could end up in the wrong place to the detriment of water quality [absent] an indisputable catch-all, there is little doubt that the recitation of the definition of 'pollutant' is designed to be suggestive not exclusive.").

susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide."  40 C.F.R. § 122.2.

The Act defines "point source" as:

> any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.

33 U.S.C. § 1362(14); *see also* 40 C.F.R. § 122.2.

In addition to providing for enforcement by state agencies and the EPA, the Act also confers jurisdiction on the federal courts to hear citizen suits brought against any person "alleged to be in violation of" the Act.[3]  33 U.S.C. § 1365(a); *see El Paso Gold Mines, Inc.*, 421 F.3d at. This includes violations of the prohibition in Section 301(a) of the Act against "the discharge of any pollutant by any person" unless authorized by a permit.  33 U.S.C. § 1311(a).

## IV.    <u>STATEMENT OF MATERIAL FACTS</u>

ACAT filed this action under the citizen suit provision of the CWA, alleging that Defendants are discharging coal from the SCLF into the Bay without a NPDES permit, as required under the Act.  Docket 1 at ¶¶ 48-75.  The ARRC transports coal, via railcar, from the Usibelli Coal Mine near Healy, Alaska, to the SCLF.  When ARRC trains arrive at the SCLF, the coal is offloaded from the railcars and stored in two stockpiles, each approximately 1,000-feet-long.  The conveyor system then delivers loads of coal as large as 400,000 tons from the stockpiles to large transport vessels for export to foreign markets.

Defendants do not dispute that coal is a pollutant when it enters waters of the U.S. Motion at 2, 3, 5, 6, and 7.  Resurrection Bay is a water of the U.S.  In this case, coal enters the

---

[3] At least 60 days prior to filing, the prospective plaintiff must provide notice of its claims to the potential defendant, the EPA, and the state in which the violations allegedly occurred.  *See* 33 U.S.C. § 1365(b)(1)(A).  If a competent state or federal agency brings a civil enforcement action against the defendant prior to the citizen's complaint being filed, or an administrative enforcement proceeding prior to the plaintiff's NOI letter, the citizen suit is preempted and must be dismissed.  *See* 33 U.S.C. §§ 1365(b)(1)(B), 1319(g)(6). In this case, no such enforcement action or proceeding has been initiated by the State or EPA.

Bay when it falls from the conveyor system into the Bay in the process of being transferred to vessels, when it becomes airborne from the stockpiles and is discharged to the Bay, and when it and the snow with which it is mixed are plowed into the Bay with heavy machinery in the winter. The Defendants do not have a permit for those discharges of coal into a water of the U.S.

AES, the operator of the SCLF, operates the facility under a Stormwater General Permit which covers the discharge of stormwater associated with industrial activity at the SCLF.[4] *See* Ex. 1 at 6; *see also* Ex. 2 at 18. Stormwater means "storm water runoff, snow melt runoff, and surface runoff and drainage." 40 C.F.R. § 122.26(b)(13). "Stormwater associated with industrial activity" is defined as:

> the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant. . . . For the categories of industries identified in this section, the term includes, but is not limited to, storm water discharges from industrial plant yards; immediate access roads and rail lines used or traveled by carriers of raw materials, manufactured products, waste material, or by-products used or created by the facility; material handling sites; refuse sites; sites used for the application or disposal of process waste waters (as defined at part 401 of this chapter); sites used for the storage and maintenance of material handling equipment; sites used for residual treatment, storage, or disposal; shipping and receiving areas; manufacturing buildings; storage areas (including tank farms) for raw materials, and intermediate and final products; and areas where industrial activity has taken place in the past and significant materials remain and are exposed to storm water. For the purposes of this paragraph, material handling activities include storage, loading and unloading, transportation, or conveyance of any raw material, intermediate product, final product, by-product or waste product.

40 C.F.R. § 122.26(b)(14). The Stormwater General Permit applies to *stormwater*, however, and does not authorize Defendants to discharge coal, coal dust, or non-stormwater containing coal, from the conveyor, stockpiles, or coal-contaminated snow into the Bay. Ex. 1 at 6-8; Ex. 2 at 18-19. The Stormwater General Permit and the MSGP Fact Sheet note that only a limited, specified

---

[4] The regulations implementing the CWA require NPDES permits for the discharge of stormwater from industrial facilities. 40 C.F.R. § 122.26. Under certain circumstances, an industrial discharger may receive authorization under a general permit for its stormwater discharges. 40 C.F.R. § 122.28.

number of non-stormwater discharges are covered under the permit as exceptions to the general exclusion for discharges of non-stormwater.  Ex. 1 at 7-8 (*e.g.* fire hydrant flushings and condensate from air conditioners); Ex. 2 at 19.  As a result, AES' discharges of coal and its constituents are not covered by, or authorized under, any NPDES permit and are therefore illegal.

V.   **ARGUMENT**

The Complaint pleads sufficient facts to state a claim for violations of the CWA. Specifically, ACAT has alleged: (1) Defendants have ongoing non-stormwater discharges of coal, coal dust, coal slurry, coal-contaminated snow, and/or coal-contaminated water from the SCLF conveyor system into the Bay without a permit (Docket 1 at ¶¶ 48-57); (2) Defendants have ongoing non-stormwater discharges of coal dust from the SCLF, including the stacker-reclaimer, coal stockpiles, railcar dumping facility, ship loader and the conveyor systems, into the Bay without a permit (Docket 1 at ¶¶ 58-66); and (3) Defendants have ongoing non-stormwater discharges of coal, coal dust, coal slurry, coal-contaminated snow, and/or coal-contaminated water from the SCLF into wetlands, ponds, and/or the Bay without a permit when they either plow coal-contaminated snow directly into navigable waters or plow snow into/above wetlands and/or ponds (navigable waters) where the plowed snow eventually melts and discharges coal directly into navigable waters (Docket 1 at ¶¶ 67-75).  These allegations of "ongoing" violations of the Act were made in good faith based on personal observations recorded by photographs of such discharges taking place.

In Defendants' Motion, Defendants do not argue that coal is not entering Resurrection Bay.  In fact, the Motion specifically acknowledges that discharges of coal from the conveyor system have occurred.  *See* Motion at 6 ("flakes of 'carry-back' (congealed coal dust) were observed falling from the conveyor near the ship loaded, and from the ship loader itself, into the Bay.").  The Motion also admits that coal is a pollutant.  Motion at 2, 3, 5, 6, and 7. Nevertheless, Defendants assert that coal falling from the conveyor, as a result of facility

operations entirely unrelated to stormwater discharges, is covered under the SCLF *Stormwater* General Permit, and therefore, that the *Stormwater* General Permit shields Defendants from liability for its non-stormwater discharges of coal under Section 402(k) of the CWA, 33 U.S.C. § 1342(k).  In other words, Defendants contend that because they have a *stormwater* permit, they may discharge coal[5] into the Bay in any manner, whatsoever, even if it is a non-stormwater discharge or prohibited discharge not covered by the Stormwater General Permit.  Using similar reasoning, Defendants also claim that the discharge of coal-contaminated snow via snowplow is covered under the Stormwater General Permit and therefore that they may discharge such snow into waters of the U.S.

Additionally, the Motion challenges Plaintiff's second claim (pertaining to the discharge of coal dust from the SCLF into Resurrection Bay) on the basis that coal storage and handling facilities within the SCLF are not point sources.  Motion at 22-25.  Again, Defendants do not claim that coal dust is not a pollutant, that coal dust entering the Bay or wetlands and ponds is not an addition of pollutants, or that the water bodies are not subject to jurisdiction under the Act.  Rather, Defendants focus exclusively on the question of whether conveyances of coal from the coal stockpiles, stacker-reclaimer, railcar dumping facility, ship loader and the conveyor systems are all, individually, "point sources" under the Act.

Taking the allegations of the Complaint as true, however, Defendants' contentions are wholly unsupported by the authorities they rely upon, or by the extrinsic evidence supplied with their Motion.[6]  First, the *Stormwater* General Permit does not authorize *non-stormwater* or coal discharges from the SCLF.  *See* Ex. 1 at 6-8.  Second, conveyances from the coal stockpiles,

---

[5] In the Motion, Defendants never state the specific "discharge" that is covered by the Stormwater General Permit and therefore shielded from liability.  The Stormwater General Permit covers stormwater discharges associated with the industrial activities at SCLF, which does not include non-stormwater discharges and direct discharges of coal to the Bay.  *See* Ex. 1 at 6-8.

[6] *See* Plaintiffs' Motion to Strike Defendants' Exhibits A, B (Including Attachment 1), C, D (Including Attachment 1), L, M, N, and O to Defendants' Motion for Judgment on the Pleadings, filed concurrently at Docket 42.

stacker-reclaimer, railcar dumping facility, ship loader and the conveyor systems are all point sources under the Act.  Because these *non-stormwater* discharges from point sources are not authorized under the *Stormwater* General Permit, Defendants are unlawfully discharging pollutants into waters of the U.S. without a permit in violation of 33 U.S.C. § 1311(a). Furthermore, because Defendants are violating the Act, and because Plaintiffs provided the required notice of intent to sue, Plaintiffs properly brought this action as a citizen suit under 33 U.S.C. § 1365(a).

> **A.    The Stormwater General Permit Does Not Shield AES From Liability For Non-Stormwater Discharges.**

Defendants assert that AES's Stormwater General Permit allows non-stormwater discharges from the conveyor, and therefore that these discharges are covered under the permit shield provided by Section 402(k) of the CWA.  However, the permit shield only protects a CWA permit-holder from facing suits *challenging the adequacy or strictness of its permit* as the permit relates to particular discharges.  *See Atl. States Legal Found., Inc. v. Eastman Kodak Co.*, 12 F.3d 353, 357 (2d Cir. 1993) (quoting *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n.28 (1977)).  ACAT does not challenge the adequacy or strictness of the Stormwater General Permit.[7]  ACAT's claims focus exclusively on unauthorized discharges wholly separate from stormwater discharges, and which occur absent stormwater events.

First, Defendants mischaracterize what types of discharges are *actually* covered under the Stormwater General Permit.  Defendants' Exhibit H specifically notes that "EPA has processed your Notice of Intent (NOI) application for the facility noted below.  **This facility is authorized to discharge storm water associated with multi-sector activity under the terms and conditions imposed by the EPA's NPDES Storm Water Multi-Sector Permit.**"  Def. Ex. H to

---

[7] If the Court finds that Defendants' discharges are covered under the Stormwater General Permit, ACAT seeks leave to amend the Complaint to allege violations of the Stormwater General Permit, as discussed in ACAT's 60-day notice letter.  *See* Docket 1, Ex. A at 4-6.

Motion at 2 (emphasis in original).  As the Stormwater General Permit clearly provides, it only authorizes certain stormwater discharges. *See* Ex. 1 at 6-8, Ex. 2 at 17-19.  Despite the fact that AES is only covered by a *stormwater* discharge permit, which explicitly only covers the discharge of "stormwater," AES asserts that this *stormwater* permit shields the facility from any liability for *non-stormwater* discharges.[8]  A permit cannot shield a discharger from liability if the discharge is not covered by the permit or was not adequately disclosed to the permitting authority, which is what Defendants seek here.  *See Piney Run Preservation Assoc. v. County Commissioners of Carrol County, Maryland*, 268 F.3d 255, 261, 266-67 (4th Cir. 2001); *see, also, Atl. States*, 12 F.3d at 356.

Defendants, relying on *Coon ex rel. Coon v. Willet Dairy, LP*, 536 F.3d 171 (2d Cir. 2008), assert that because they are in compliance with the stormwater permit they are shielded from any further liability for CWA violations.  *See* Motion at 14.  However, courts have repeatedly declined to extend the limited scope of the CWA "permit shield" to cover violations such as those at issue in this case.  *See Piney Run*, 268 F.3d at 261, 266-67, and *Atl. States*, 12 F.3d at 356.  In *Piney Run* and *Atl. States*, the court rejected the argument that the permit shield is broad enough to immunize polluters from liability for the discharge of any and all pollutants, deferring to EPA's interpretation of Section 402(k).  *Id*.  EPA's guidance noted that authorized discharges are those within "the specified scope of a particular permit …."  EPA Revised Policy Statement on Scope of Discharge Authorization and Shield Associated with NPDES Permits, attached as Ex. 3 at 3.  Because the General Permit is for "industrial stormwater" discharges, the scope of authorization only extends to stormwater discharges.

*Piney Run* and *Atl. States* hold that the permit shield is only available for those pollutants that were adequately disclosed to the permitting authority at the time the polluter obtained its permit.  Under the reasoning in *Piney Run*, Section 402(k) does not protect a permit holder from

---

[8] The Stormwater General Permit identifies a list of allowable non-stormwater discharges, none of which include the type of non-stormwater discharge at issue here.  *See* Ex. 1 at 7; Ex. 2 at 19.

liability for the discharge of a pollutant "that was not within the reasonable contemplation of the permitting authority at the time the permit was granted." *Piney Run,* 268 F.3d at 259.  The Court explained that "[b]ecause the permitting scheme is dependent on the permitting authority being able to judge whether the discharge of a particular pollutant constitutes a significant threat to the environment, *discharges not within the reasonable contemplation of the permitting authority during the application process*, whether spills or otherwise, do not come within the protection of the permit shield." *Id*. at 268 (emphasis added).

In other words, at issue in *Piney Run* and *Atl. States* was whether a polluter was liable for the discharge of additional pollutants beyond those authorized by its NPDES permit.  In contrast, in this case ACAT does not allege that AES is discharging additional pollutants beyond those identified in the Stormwater General Permit.  Rather, ACAT alleges that AES is causing non-stormwater discharges that are entirely separate from any discharges either authorized in the Stormwater General Permit, or contemplated by the permitting authority that issued the Stormwater General Permit.  Thus, Defendants' argument cannot find support in the decisions of the courts in *Piney Run* and *Atl. States*.

This Court is not faced with a question of whether a permit that authorizes the discharge of certain pollutants shields the permittee from liability for the discharge of a pollutant not identified in the permit.  Rather, this Court faces the question of whether a permit for a specific class of discharge – stormwater – shields a polluter from liability for another class of discharge – non-stormwater – and thereby allows the polluter to engage in those additional discharges without any, or the proper, permit.  While *Piney Run* and *Atl. States* dealt with the coverage of a permit shield based on the disclosure or contemplation of the *identity* of certain pollutants, Plaintiffs' claims relate to discharges of a *nature* that are not covered by Defendants' permit, and were not contemplated by the permitting authority.

Because Defendants are only covered by a permit for stormwater discharges, and EPA (at the time of application) only reviewed stormwater discharges, there was no "reasonable

contemplation" by EPA of other non-stormwater discharges.  When the permit initially was issued, the applicant had sought a "stormwater permit" – seeking to have the stormwater permit converted from an individual permit to a general permit.  *See* Def. Ex. H.  Defendants have not identified any extrinsic evidence that indicates that the permittee disclosed, or the agency "reasonably contemplated," discharges beyond stormwater discharges.[9]  While Defendants assert that the agency was aware of the discharges at issue in this case, citing to their Stormwater Pollution Prevention Plan ("SWPPP") as evidence of additional controls put in place in 2009, those revisions were not before the agency when it initially permitted the facility for stormwater discharges.  Additionally, the fact that the SWPPP put more pollution controls in place does not, as Defendants assert, "demonstrate[] the potential for discharge from the conveyor and the understanding by EPA and the permittee that such discharges are regulated under the General Permit."  Motion at 12.  The SWPPP is merely the implementation of the permit requirements by the permittee.  Ex. 1 at 30.  Furthermore, Defendants' attempt to rely on the SWPPP as evidence that EPA was aware of the discharges at issue in this case is undermined by the absence of any reference in the SWPPP section on "Non-Storm Water Discharges Documentation" (SWPPP section 2.3) to any of the discharges at issue in this case.[10]  *See* Def. Ex. E at 9.

Defendants also cite to a 1988 inspection report that indicated that wet coal fines fall from the conveyor.  Def. Ex. F at 3.  First, at the time, EPA was inspecting the facility for compliance with its stormwater permit and nothing in the report indicates that EPA was inspecting for violations outside of those relating to the Stormwater General Permit.  *Id.*  Second, the report identifies "wet coal dust falling from the conveyor" and "spilled coal" at the end of the

---

[9] In fact, relevant documents, such a AES's 2007 permit application, a March 1, 2007 e-mail from EPA to AES, and AES's May 2009 Notice of Intent for coverage under the stormwater multi-sector general permit, do not provide any indication that (1) AES notified EPA about the non-stormwater discharges at issue in this case and (2) that EPA contemplated those non-stormwater discharges.  *See* Def. Ex. A, Attach 2, at 1-8; Ex. I, at 1-3; and Ex. J, at 1-3.

[10] The only non-stormwater discharges listed in the SWPPP as "occur[ing] onsite" are "[f]ire hydrant flushing," "[p]otable water sources and line flushing," "[f]ire fighting discharges," and "[u]ncontaminated groundwater." *See* Def. Ex. E at 9-10.

pier, but the report does not identify the nature of those discharges, e.g. that such discharges were not stormwater associated with industrial activity.  *See* Def. Ex. F at 3 and 7.

Nothing in Defendants' cited exhibits states that the EPA, at the time of permitting, contemplated non-stormwater discharges of coal.[11]  Additionally, even if Defendants' assertions that the agency knew of non-stormwater discharges in 1988 are correct, such knowledge of other discharges only raises questions about enforcement, and does not show that the EPA intended to permit the non-stormwater discharges as part of the Stormwater General Permit.  The knowledge on the part of EPA of such discharges in no way indicates that at the time of permitting the agency "reasonably contemplated" the non-stormwater discharges as discharges covered by the Stormwater General Permit.  Consequently, the non-stormwater discharge of coal was not adequately disclosed at the time of permitting, the permitting authority did not contemplate non-stormwater discharges of coal at the time of permit issuance or re-issuance, and Defendants are not protected from liability through the permit shield.

Further, as the Fourth Circuit noted in *Piney Run*,

> the scope of the permit shield defense is relatively straightforward.  An NPDES permit holder *is shielded* from CWA liability *for discharges in compliance with its permit,* and *is liable for any discharges not in compliance with its permit.*

268 F.3d at 269 (emphasis added).  While Defendants have an NPDES general permit for stormwater discharges, the permit only authorizes a few select non-stormwater discharges, none of which cover the discharges at issue in this case.  There is therefore no authority for Defendants' contention that Section 402(k) allows them to discharge pollutants that are not covered by the Stormwater General Permit, which were not disclosed to the permitting agency at the time they applied for their permit.  Thus, the permit shield does not apply in this case.

### B.   ACAT Properly Brought this Citizen Suit Under the Act, and was Not Required to First Petition EPA to Require an Individual NPDES Permit.

ACAT's claims challenge the unpermitted discharges of coal from the SCLF.  As a

---

[11] *Id.*

citizen suit under the CWA, the only prerequisite to filing an enforcement action is the 60-day
notice to the discharger and state and federal agencies.  *See* 33 U.S.C. § 1365(b).  Yet,
Defendants argue that ACAT has not "avail[ed itself] of administrative remedies prior to
bringing this case."  Motion at 15.  Defendants misperceive and misrepresent ACAT's claims
and the Act.

Although Plaintiffs do not challenge the adequacy of the Stormwater General Permit
under the CWA, Defendants assert that Plaintiffs are challenging "EPA's decision to allow
operation of the Loading Facility under the General Permit, as opposed to an individual permit",
and that, therefore, ACAT should "have objected to EPA's decision to permit this facility under
the General Permit."  Motion at 16-17.  As discussed in the Complaint and above, however,
ACAT does not challenge the adequacy of the Stormwater General Permit for the covered
stormwater discharges.  *Cf. Legal Envtl. Assistance Found. v. Hodel*, 586 F. Supp. 1163, 1167
(E.D. Tenn. 1984) (rejecting the contention that an unpermitted discharge suit based on
discharges not identified in the existing permit was a collateral attack on the permit terms).  The
Stormwater General Permit does not authorize non-stormwater discharges of coal from the
conveyor belt and ACAT does not challenge discharges covered under the Stormwater General
Permit.

Other courts have rejected similar efforts to characterize a citizen suit enforcement
action, such as this one, as an impermissible collateral attack on a polluter's permit.  In *Ohio
Valley Environmental Coalition v. Apogee Coal Co., LLC*, 531 F. Supp. 2d 747 (S.D. W.Va.
2008), the coal company made a similar argument that the plaintiffs' action was not "a traditional
citizen suit," but rather was "an impermissible attack on permitting decisions of the [agency]."
*Id.* at 753.  In that case, the court rightfully rejected the argument, observing among other things,
that

> the plaintiff is the master of the complaint . . . .  Plaintiff has not alleged any
> claims directly against the state or any state representatives.  The issue regarding

the validity of the permit modifications arises only because Defendants have
brought them up as a defense.

*Id.* at 756.  Likewise, the terms of Defendants' Stormwater General Permit arise only because

Defendants assert that the Stormwater General Permit shields them from liability for any

discharges not specifically authorized in the permit.

      Defendants' argument that ACAT should have exhausted the administrative remedy of

petitioning EPA to issue an individual permit rather than a general permit for its stormwater

discharges is similarly unavailing.  The petition regulation states:

> The Director *may* require any discharger authorized by a general permit to apply
> for and obtain an individual NPDES permit.  Any interested person *may* petition
> the Director to take action under this paragraph.

40 C.F.R. § 122.28(b)(3)(i) (emphasis added).

      A petition to seek an individual permit is purely discretionary on the part of the

petitioner, as demonstrated by EPA's use of the permissive "may."[12]  Further, the petition

process only allows a petitioner to seek the requirement of an individual permit in the place of a

general permit.  As stated, ACAT does not dispute the application of the Stormwater General

Permit for *stormwater* discharges.  ACAT seeks to enforce the requirement that Defendants

obtain an NPDES permit for the *unpermitted* discharges of coal.  Thus, Defendants' contentions

that ACAT has not availed itself of the requisite administrative remedies to object to the

---

[12] Relying on an unpublished 10th Circuit case regarding groundwater seepage from a mine waste
pile, Defendants assert that parties that fail to comment during agency permit proceedings may not later bring a
citizen suit.  *See* Motion at 16 *citing Amigos Bravos v. Molycorp, Inc.*, No. 97-2327, 1998 WL 792159 (10th
Cir. 1998).  In *Amigos Bravos*, the court held plaintiffs could not bring a CWA citizen suit challenging a matter
rejected by EPA after it was raised in the public comment period.  However, unlike *Amigos Bravos*, which
involved a challenge to the renewal of an *individual* permit with specific administrative appeal procedures,
ACAT is not challenging the issuance of Defendants' general permit.  *See Amigos Bravos*, 1998 WL at 3-4
(holding that plaintiffs challenging a permit renewal must follow the administrative procedures pursuant to 33
U.S.C. § 1369(b)(1)(F)).  The decision to include a facility under a general permit is not made public and there
are no opportunities to comment on the decision to issue a permittee a general permit.  When Defendants
submitted their Notice of Intent to be covered under the Stormwater General Permit, there was no public
process to challenge Defendants' coverage under the Permit.  Consequently, *Amigos Bravos* is inapplicable.
Further, it would be counter to the intent of the Act to require Plaintiffs to administratively appeal, or to file a
purely discretionary petition for, an issue that was never before the agency at the time of permit coverage,
especially when there was no public notice or any opportunity to comment at that time.

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION                        Page 14
TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
*Alaska Community Action on Toxics, et al. v. Aurora Energy Services*, et al.
Case No. 3:09-CV-00255-TMB

Stormwater General Permit and therefore is precluded from bringing this action are unfounded and must be rejected.

### C.      Citizen Suits For Violations of Section 402 of the Act Are Not Precluded.

Defendants argue that causes of action under the citizen suit provision are limited to challenges of "effluent standards or limitations."  *See* Motion at 14-15.  Defendants, therefore, assert that because "Plaintiffs' assertion is not a claim for violation of an 'effluent standard or limitation,' it is not permissible under 33 U.S.C. § 1365(a)."  *See* Motion at 14-15.  They further misrepresent ACAT's claims by stating that "Plaintiffs object to permitting under the General Permit . . . ."  Motion at 15.  Defendants misperceive the limitations of the citizen suit provision and ACAT's claims.  ACAT does not object to a Stormwater General Permit for the SCLF.  Rather, as highlighted above, ACAT challenges Defendants' unlawful discharge of pollutants into the Bay *without* a permit for the non-stormwater discharge of coal.

The Act defines "effluent standard or limitation" to include "unlawful act[s] under subsection (a) of 1311 . . . ."  33 U.S.C. § 1365(f).  Section 1311(a) prohibits the unpermitted discharge of a pollutant.  33 U.S.C. § 1311(a).  Courts have consistently held that "point source owners can be liable under Sections 301(a) *and* 402 of the CWA for unpermitted discharges."  *See e.g., El Paso Gold Mines*, 421 F.3d at 1146 (emphasis added).  Consequently, ACAT has properly pled violations of Section 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342, and has properly brought these claims under the citizen suit provision, 33 U.S.C. § 1365(a).

### D.      ACAT's Citizen Suit In No Way Undermines the Intent of the CWA.

Defendants assert that because they are in compliance with their Stormwater General Permit, they are entitled to the certainty of being shielded from the type of arguments advanced in this case.  Motion at 17.  First, this argument is, in essence, another attempt to argue that Section 402(k) shields Defendants from liability, which ACAT has addressed above.  Second, Defendants' assertions that ACAT "could have easily petitioned EPA" (*id.*) are irrelevant to citizen suits brought under the Act, as also discussed above.  Third, ACAT's position will in no

way "disrupt EPA's regulatory regime."  *See id*.  This challenge is not a collateral attack on EPA and the deference it is entitled to in permit decision-making.  If ACAT was challenging the permit decision, they would have done so and they would have named EPA as the defendant, not the polluters violating the terms of the Act.  By mischaracterizing ACAT's arguments as a challenge to agency decision-making, Defendants improperly attempt to escape liability under the Act for *unpermitted* discharges.

The CWA imposes strict liability for violations of the Act.  *See* 33 U.S.C. § 1319(d).  In passing the Act, Congress recognized the value of citizens acting as private attorneys general, by allowing citizens to bring citizen suits.  *See Gwaltney of Smithfield v. Chesapeake Bay Foundation*, 484 U.S. 49, 60 (1987).  ACAT has alleged that Defendants are discharging pollutants without a permit.  Such an action falls squarely within the scope and intent of the citizen suit provision, making it appropriate for ACAT to bring a CWA enforcement action.[13]

### E.   The Coal Stockpile, Stacker-Reclaimer, Railcar Dumping Facility, Ship Loader and Conveyor Systems Are All Point Sources for Coal Discharges.

Defendants are not entitled to judgment on the pleadings on Count II because they are not challenging the subject matter jurisdiction of the claim, but rather the merits of the claim.  As such, the standard of review is that of a motion to dismiss: has a claim been stated upon which relief can be granted, taking as true the allegations in the Complaint?  *See* FRCP 12(b)(6).  Defendants have not satisfied their burden of showing that the claims set forth in ACAT's Complaint do not satisfy this standard.  In the event that the Court reaches this substantive issue

---

[13] Defendants also argue that Congress did not intend for the CWA to cover this type of discharge.  Motion at 20-21.  However, the referenced citations refer to general atmospheric deposition.  This case focuses on the discharge of a pollutant from a point source to waters of the U.S.  If these elements exist, the CWA prohibits such discharge without a permit.  In addition, Defendants argue that the Court should defer to the State Department of Environmental Conservations' ("DEC") decision to issue a notice of violation to Defendants for uncontrolled coal dust.  Motion at 21.  The DEC's notice of violation is entirely irrelevant to the claims brought in this case and has no bearing on jurisdiction under the CWA.  Citizen suits are only precluded when agencies have, or are, diligently prosecuting violations.  *See Knee Deep Cattle Co., Inc. v. Bindana Inv. Co. Ltd*. 94 F.3d 514, 516 (9th Cir. 1996) (citations omitted) (diligent prosecution requires the assessment of a penalty for the violations at issue).

by converting Defendants' motion for judgment on the pleadings to a motion for summary judgment (which ACAT opposes without further discovery), ACAT provides the following argument in response.

A NPDES permit is required for any discharge of a pollutant "from any point source."  33 U.S.C. § 1362(12).  Defendants assert that the coal stockpiles and "handling activities"[14] are not point sources and therefore not subject to the NPDES permitting requirements.

Defendants highlight the Second Circuit's emphasis of the "channelization requirement," in arguing that windblown coal dust does not constitute a point source.  *See* Motion at 18-20.  Defendants focus on the "process that conveys coal dust to the Bay . . . is a non-human-directed or designed activity that disperses material."  Motion at 20.  Under the Act, "[t]he term 'point source' means any discernible, confined and discrete conveyance."  33 U.S.C. § 1362(14).  "Human-directed" or "human activity" is not a modifier of "point source."  Natural conveyances and processes may be the mode of addition of a pollutant to waters of the U.S.  Nevertheless, all of the point sources identified in Count II, including the two coal stockpiles, are "human-directed."  In addition to the human operation of the railcar dumping facility, the stacker-reclaimer, the ship loader, and the conveyor, the placement and maintenance of the stockpiles directly adjacent to Resurrection Bay is a human-directed activity.

As noted above, the question for this Court in Count II is whether the coal dust conveyance is from a point source.  When determining whether a source is a point source or a non-point source, the Ninth Circuit looks to the traceability of the discharge to a single identifiable source.  The Ninth Circuit has noted that "Congress ha[s] classified nonpoint source pollution as *runoff* caused primarily by rainfall around activities that employ or create pollutants.  Such *runoff* could not be traced to any identifiable point of discharge."  *Oregon Natural Desert*

---

[14] Defendants fail to define "handling activities," but because Defendants assert that there is no jurisdiction to hear ACAT's Claim II, ACAT assumes "handling activities" refers to the following point sources identified in the Complaint: (1) the railcar dumping facility; (2) stacker-reclaimer; (3) ship loader; and (4) coal conveyor systems.  *See* Docket 1 at 12, ¶ 62.

*Ass'n v. Dombeck*, 172 F.3d 1092, 1098 (9th Cir. 1998) (emphasis added) citing *Trustees for Alaska v. EPA*, 749 F.2d 549, 558 (9th Cir. 1984); *see also United States v. Earth Sciences, Inc.*, 599 F.2d 368, 373 (10th Cir. 1979) (reasoning that non-point sources of pollution "are virtually impossible to isolate to one polluter" and that "it contravenes the intent of FWPCA and the structure of the statute to exempt from regulation any activity that emits pollution from an identifiable point"). As the Ninth Circuit has also noted, "nonpoint source pollution . . . is widely understood to be the type of pollution that arises from many dispersed activities over large areas . . . not traceable to any single discrete source." *League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181, 1184 (9th Cir. 2002); *see also Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 219 (2d Cir. 2009) *citing* Frank P. Grad, *Treatise on Environmental Law* § 3.03 (updated 2009) ("Nonpoint sources include pollution from *diffuse land use activities* such as agriculture, construction and mining that enter the waters primarily through indiscrete and less identifiable natural processes such as runoffs, precipitation and percolation.") (emphasis added). Unlike non-point source pollutants that cannot be traced to any identifiable point, the coal dust in this case can be traced to the coal stockpiles and facilities at the SCLF.

In determining if the pollutant comes from a point source, the Court must find that there is a "discernible, confined and discrete conveyance." *See* 33 U.S.C. § 1362(14). The "definition of a point source is to be broadly interpreted" and "embrac[es] the broadest possible definition of any identifiable conveyance from which pollutants might enter waters of the United States." *Cordiano*, 575 F.3d at 219. The focus of the analysis is whether one can identify where the pollutant comes from. While wind-transported pollutants may be less common, the requisite elements for establishing a point source are present and well-established in ACAT's pleadings for facilities at the SCLF that convey pollutants to the Bay via wind.

Although Defendants cite CWA cases involving airborne transport of pollutants, Defendants fail to establish how wind-transported coal dust from the SCLF is not a discernible, confined and discrete conveyance when emanating from identifiable sources at the SCLF.

Moreover, Defendants muddy the waters by conflating the source of the pollutants with the means by which they are conveyed.

First, the source of the pollutants is readily identifiable.  Coal dust is generated at the coal stockpiles, railcar dumping facility, stacker-reclaimer, ship loader, and the conveyor systems. Each of these sites within the SCLF is an identifiable and discrete source of coal dust.  Even the stockpiles, about which the Defendants raise their most significant challenges, are common point sources under the Act.  *See Consolidated Coal v. Costle*, 604 F.2d 239, 249 (4th Cir. 1979) (coal storage stockpiles were point sources because they were identifiable); *Sierra Club v. Abston Constr. Co., Inc.*, 620 F.2d 41, 46 (5th Cir. 1980) (coal piles were point sources because they were identifiable and the runoff that ran through the pile was conveyed via a ditch to waters of the U.S.); *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1009 (11th Cir. 2004) (identifying scrap metal piles as point sources); *Friends of Santa Fe County v. LAC Minerals, Inc.*, 892 F. Supp. 1333, 1359 (D.N.M. 1995) (holding that conveyances from mining overburden piles are point sources).

In addition, EPA's own guidance pertaining to point versus nonpoint source pollution specifically identifies "piles" as point sources:

> [Nonpoint source pollution] is caused by diffuse sources that are not regulated as point sources and normally associated with agricultural, silvicultural and urban runoff, runoff from construction activities, etc.  Such pollution results in the human-made or human-induced alteration of the chemical, physical, biological, and radiological integrity of water.  In practical terms, nonpoint source pollution <u>does not result from a discharge at a specific, single location (such as a pile)</u> but generally results from land runoff, precipitation, atmospheric deposition or percolation.

EPA Office of Water, *Nonpoint Source Guidance* 3, 5 (1987); *see also* Nonpoint Source Program and Grants Guidelines for States and Territories, 68 Fed. Reg. 60653, 60655 (Oct. 23, 2003).

Defendants seek to confuse this issue by focusing on the manner in which the pollutant is conveyed, via wind, rather than on the question of whether the source of the pollutant is discrete and identifiable.  To that end, Defendants rely on cases where the means of conveyance was

unidentifiable to assert that the stockpiles, railcar dumping facility, stacker-reclaimer, ship

loader, and the conveyor systems are not point sources. Specifically, Defendants focus on the

need for "channelization" of the pollutants into waters of the U.S. *See* Motion at 19 *citing*

*Cordiano*, 575 F.3d 199.[15]

       When presented with questions of whether a point source exists, courts focus on

channelization in instances where, absent a ditch or other channelization of the pollutants, the

pollutants would not be regulatable and the source would be non-point source runoff. In

contrast, in this case, Defendants discharge pollutants directly into Resurrection Bay from readily

identifiable points at the SCLF that could easily be regulated and controlled. This case does not

involve diffuse run-off where channelization might be required in order to identify and regulate

the pollutants. Consequently, cases involving the channelization of run-off are inapposite to the

matter at hand whereas cases that have addressed the discharge of pollutants, dispersed through

---

[15] Channelization is relevant for cases like *Concerned Area Residents for Environment v. Southview Farm*, 34 F.3d 114, 118 (2d Cir. 1994) and *United States v. Oxford Royal Mushroom Prods., Inc.*, 487 F. Supp. 852, 854 (E.D. Pa. 1980), where a party sprays pesticides or fertilizers onto land, and then, through run-off, those pollutants are directed to waters of the U.S. via a ditch. In those cases, the channelization was key to finding the land area to be a point source because the initial application of pesticides to crops was not directly into waters of the U.S.

       Similarly, in *Cordiano*, the court found that an engineered earthen berm used to contain bullets at the back of a shooting range was not a point source because there was "no evidence" that pollutants moved into navigable waters. *Cordiano*, 575 F.3d at 222-23. However, the court was careful to note that "our holding is not that a berm can never constitute a point source, but only that there is insufficient evidence that the migration of lead from Metacon's berm by virtue of runoff and airborne dust is a point source discharge." *Id.* at 224. While viewing the facts in the light most favorable to the non-moving party—the defendants—the Second Circuit found that the record contained no evidence that the berm serves as a "confined and discrete conveyance" and that there was "no evidence that airborne lead moves by any 'discernible, confined and discrete conveyance'" to the wetlands. *Id.* at 222-24. *But, compare, Stone v. Naperville Park Dist.*, 38 F. Supp. 2d 651, 655 (N.D. Ill. 1999) (addressing a similar channelization argument at a shooting range and noting that the argument that a shooting range does not "channel anything …. is simply wrong. The range 'channels' shooting by providing a facility at which individuals may shoot; it channels the discharge of pollutants by inviting individuals to come shoot at airborne clay targets that land in the water with lead shot that also lands in the water."). The *Cordiano* court also found that the plaintiff's "vague references to potential surface water runoff and windblown dust from the berm are insufficient to raise a material issue of fact that these are point source discharges." *Id*. at 224. *Cordiano* is distinguishable from the case at hand because the coal entering Resurrection Bay is easily traceable to the sources and conveyances identified in Count II of ACAT's Complaint, and because ACAT has clearly and specifically alleged that coal dust from these sources and conveyances enters Resurrection Bay.

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION          Page 20
TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
*Alaska Community Action on Toxics, et al. v. Aurora Energy Services*, et al.
Case No. 3:09-CV-00255-TMB

the air, directly into waters of the U.S., such as pesticide applications, are much more instructive for this Court.

In *No Spray Coalition v. City of New York*, the defendants raised the same argument as those presented here—that "atmospheric emissions . . . do not constitute discharges." 2005 WL 1354041, *3 (S.D.N.Y. June 8, 2005). The Court declined to accept that argument and instead found that the spraying of pollutants through the air directly into navigable waters was an unlawful discharge of pollutants from a point source. *Id*. at *5. In that case, trucks and helicopters sprayed a mist of pesticides that landed directly in waters of the U.S. *Id.* at *2. The Court noted that "the fact that the pesticide is initially sprayed into the air as a fine mist" does not change the "addition" status so long as "the mist descends downward into the water." *Id.* at *12-13. The court went on to state that it "would be unreasonable to distinguish between a sprayer releasing a fine mist pollutant into the atmosphere over the water and a pipe that released the same single flow of pollutant directly into water." *Id.* at *13. If such a distinction existed, "[v]iolators of the CWA would then need only to attach an airborne mist blower or hydraulic sprayer to their pipe to discharge a pollutant over the water in order to escape liability or regulation." *Id.* Similarly, in *League of Wilderness Defenders* the court found that regardless of the fact that the pesticide applications would be subject to shifts from wind, the aircraft applying the pesticide was a point source because it was "spraying pesticide from mechanical sprayers directly over covered waters." 309 F.3d at 1185.

When considering the pollutants at the SCLF, the issue is not the airborne nature of the coal dust, but rather the sources of the coal dust, and the fact that these sources are all discernible, confined and discrete. In *Peconic Baykeeper, Inc. v. Suffolk County*, 600 F.3d 180 (2d Cir. 2010), the Court found helicopters and trucks to be point sources for pesticide applications regardless of the fact that the pesticides were conveyed through the air prior to landing in waters of the U.S.:

Here, the spray apparatus was attached to trucks and helicopters, and was the

source of the discharge.  The pesticides were discharged "from" the source, and *not from the air.*  The word "from" is defined "to indicate a starting point," and also denotes the "source or original or moving force of something . . . ." Webster's Third International Dictionary Unabridged 913 (2002). The district court's conclusion that the pesticides were not discharged from a point source was in error.

*Id.* at 188-189 (emphasis added).

In this case, the coal dust generated at several identifiable, discrete facilities at the SCLF is conveyed directly into Resurrection Bay.  Following *No Spray Coalition*, *Peconic Baykeeper* and *League of Wilderness Defenders*, the fact that the coal dust becomes airborne and transported via wind before it settles into the water has no bearing on whether there is an addition of a pollutant from a point source.

In *Stone v. Naperville Park Dist.*, a suit was brought under the CWA against the operators of a trap shooting facility where clay targets and lead shot fell from the facility into navigable water.  38 F.Supp.2d at 655.  The court found that the facility was a point source under the CWA because the shooting range (the pollutant was the lead shot) was "certainly 'discernible, confined and discrete.'"  *Id.*  The important factor was not that the pollutant travelled through the air, but rather whether the pollutant landed in the water.  *Id.*; *see also, e.g. Romero-Barcelo v. Brown*, 478 F. Supp. 646, 664 (D.P.R. 1979), *rev'd on other grounds*, 643 F.2d 835 (1st Cir. 1981), *aff'd sub nom.*, *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ("It would be a strained construction of unambiguous language for the Court to interpret that the release or firing of ordnance from aircraft into the navigable waters of Vieques is not '. . . an addition of any pollutant . . . from any point source . . .", particularly in view of the broad rather than narrow interpretation given to this type of statute."); *Long Island Soundkeeper Fund, Inc. v. New York Athletic Club of City of New York*, 1996 WL 131863, 13-14 (S.D.N.Y. 1996) (trap shooting range systematically directed over Long Island Sound is an identifiable source from which spent shot and target fragments are conveyed into navigable waters of the United States).

Similarly, Defendants store and handle coal at discrete locations at the SCLF where it is

then subject to wind which deposits the coal dust directly into the Bay.  Additionally, due to the process of how the coal is stored in the stockpiles, and how it is loaded and unloaded from the railcars, onto the conveyor, and onto vessels, Defendants generate coal dust that is blown, via the wind, directly over the Bay, and discharged.  The coal dust is clearly and identifiably conveyed from these point sources at the SCLF directly into Resurrection Bay.

Unlike *Cordiano*, where the procedural posture of the case required the court to view all facts in the light most favorable to the defendants and there was "no evidence" of pollutants being discharged from the alleged point source into navigable waters, here the appropriate standard of review requires this Court to resolve all doubts in the light most favorable to ACAT. *See Cordiano,* 575 F.3d at 222-25.  Additionally, ACAT has pled facts and already presented significant photographic evidence documenting the discharge of pollutants into Resurrection Bay from identifiable and easily regulated point sources within the SCLF.  *See* Ex. A to Docket 1 (NOI attached photos Exs. 24-37).

**F.     Plowing Coal-Contaminated Snow Directly Into Waters of the U.S. Is Not a Discharge Covered Under the Stormwater General Permit.**

Defendants argue that because the loading dock is located within Drainage Area H on the map in the SWPPP, the removal of snow into the Bay is covered under the Stormwater General Permit.  Motion at 21-22.  However, Defendants fail to accurately identify the types of discharges actually authorized by the Stormwater General Permit.[16]  First, Defendants' Motion cites not to the General Permit, but rather the SWPPP.  *See* Motion at 22 n.109-110.  Yet, as noted above, only the Stormwater General Permit authorizes stormwater discharges, not the SWPPP.[17]  Ex. 1 at 6-8, 30; Ex. 2 at 18-19.  However, neither the Stormwater General Permit, nor the SWPPP authorize the discharge of snow, including snow that contains coal, directly into

---

[16] In fact, while Defendants assert that the discharges for snow removal from the dock are covered under the Stormwater General Permit, they fail to provide a cite to the Permit.  *See* Motion at 22 n.112.

[17] The authorization for stormwater discharges comes from the permit, not the SWPPP.  *See* Ex. 1 at 30.

the Bay or other waters of the U.S.  *See Id.*; Def. Ex. E at 13-14 (describing all outfalls for stormwater discharges without any mention or authorization for discharges from snow plowed directly into the Bay).  The Stormwater General Permit identifies "Non-Storm Water Discharges" – but does not include coal-contaminated snow piles or plowed snow (or coal flakes from the conveyor or coal dust for that matter).  Ex. 1 at 6-8; Ex. 2 at 18-19.  While snow-melt that runs off through the specified outfalls seems to be covered under the Permit, plowing[18] contaminated snow directly into the Bay is not covered.  *See* 40 C.F.R. § 122.26(b)(13) ("Storm water means storm water runoff, *snow melt runoff*, and surface runoff and drainage") (emphasis added).

### G.    Failure to Obtain an NPDES Permit Is an Ongoing Violation of the CWA.

Defendants mischaracterize ACAT's claims as asserting "an independent cause of action under Section 402" and a violation of the Clean Water Act "even for *potential* discharges."  *See* Motion at 23.  However, even a quick review of the Complaint and Notice of Intent indicate that ACAT alleges a violation of Section 301(a), which incorporates Section 402, through *actual* unpermitted discharges that are likely to reoccur in the future.  *See* Docket 1 (Complaint) at 9-13; Ex. A to Docket 1 (NOI) at 4-6.  The citizen suit provision clearly states that a violation of an effluent standard or limitation is actionable, and as discussed above, not having a permit is a violation.[19]

Because, ACAT properly pled that Defendants are in violation of Section 301(a) for discharging pollutants into navigable water without a Section 402 permit, and that these actual

---

[18] Plow trucks are point sources under the Act.  *See, e.g., Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 922 (5th Cir.1983) (bulldozers and backhoes constitute point sources under the CWA); *United States v. Tull*, 615 F. Supp. 610, 622 (E.D. Va.1983) (identifying bulldozers and dump trucks as point sources), *aff'd*, 769 F.2d 182 (4th Cir. 1985), *rev'd on other grounds*, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987); *United States v. Weisman*, 489 F. Supp. 1331, 1337 (M.D. Fla.1980) (identifying bulldozers and dump trucks as point sources).

[19] ACAT believes that unpermitted discharge cases rarely reach a decision on the merits since the violation is easily rectified by the violator obtaining a permit.

discharges are likely to reoccur, ACAT's action under the citizen suit provisions of the Clean Water Act is proper.  The citizen suit provision of the Clean Water Act allows citizen enforcement for: (1) the discharge of any pollutant into navigable water without a permit; and (2) as other courts have noted, when an individual intermittently violates an effluent standard or limitation, the person's "failure to obtain a permit amount[s] to a continuing violation of the act." *See Carr v. Alta Verde Industries, Inc.*, 931 F.2d 1055, 1057, 1061 (5th Cir. 1991); *see also Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*, 890 F.2d 690, 693 (4th Cir. 1989) (finding that a plaintiff "could prove an ongoing violation . . . by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations").  Thus, Defendants' failure to obtain a permit for their intermittent discharges is a continuous violation for which ACAT properly seeks to enforce against through the Act's citizen suit provision.  *See* 33 U.S.C. §§ 1311(a), 1365(a) and (f).

## VI.   CONCLUSION

For the foregoing reasons, ACAT has stated sufficient facts that, when taken as true, state a claim for relief that is plausible on its face.  In addition, Defendants' assertions of facts outside the Complaint to establish a jurisdictional flaw due to a permit shield is also without merit. Therefore, Defendants' Motion for Judgment on the Pleadings should be denied.

**DATED**:  May 24, 2010                         Respectfully submitted,

      /s Brian Litmans
Brian Litmans (AK Bar No. 0111068)
Austin Williams (AK Bar No. 0911067)
Victoria Clark (AK Bar No. 0401001)
Trustees for Alaska
1026 W. Fourth Avenue, Suite. 201
Anchorage, AK 99501
(907) 276-4244
Fax (907) 276-7110
Email: blitmans@trustees.org
awilliams@trustees.org
vclark@trustees.org

      /s Aaron Isherwood

Aaron Isherwood, Admitted *Pro Hac Vice*
Peter Morgan, Admitted *Pro Hac Vice*
Sierra Club Environmental Law Program
85 Second Street, 2d Floor
San Francisco, CA 94105-3441
(415) 977-5680
Fax: (415) 977-5793
aaron.isherwood@sierraclub.org
peter.morgan@sierraclub.org

Attorneys for Plaintiffs
ALASKA COMMUNITY ACTION ON TOXICS
AND ALASKA CHAPTER OF THE SIERRA
CLUB

**CERTIFICATE OF SERVICE**

I certify that on May 24, 2010, a copy of the **Opposition to Defendants' Motion for Judgment on the Pleadings** was served electronically upon:

Counsel for Alaska Railroad Corp.

Jeffrey M. Feldman
Feldman Orlansky & Sanders
500 L Street, Suite 400
Anchorage, Alaska 99501
907.272.3538
907.274.0819 (fax)
feldman@frozenlaw.com

Ralph H. Palumbo
Summit Law Group PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
206.676-7000
206.676-7001 (fax)
ralphp@summitlaw.com

Denise Ashbaugh
Summit Law Group PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
206.676-7000
206.676-7001 (fax)
denisea@summitlaw.com

Counsel for Aurora Energy Services

Kyle W. Parker
Crowell & Moring LLP
1029 W. 3rd Avenue, Suite 402
Anchorage, Alaska 99501
Telephone: (907) 865-2600
Facsimile: (907) 865-2680
kparker@crowell.com

David J. Mayberry
Crowell & Moring LLP
1029 W. 3rd Avenue, Suite 402
Anchorage, Alaska 99501
Telephone: (907) 865-2600
Facsimile: (907) 865-2680
dmayberry@crowell.com

John C. Martin
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
JMartin@crowell.com

Susan M. Mathiascheck
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
SMathiascheck@crowell.com

_Brian Litmans_

Brian Litmans

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION                    Page 27
TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
*Alaska Community Action on Toxics, et al. v. Aurora Energy Services*, et al.
Case No. 3:09-CV-00255-TMB