IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

ALASKA COMMUNITY ACTION ON
TOXICS and ALASKA CHAPTER OF THE
SIERRA CLUB,

                    Plaintiffs,

        v.

AURORA ENERGY SERVICES, LLC and
ALASKA RAILROAD CORPORATION,

                Defendants.

Case No. 3:09-cv-00255-TMB

**ORDER**

      This is an action by two environmental groups against the owner and operator of the

Seward Coal Loading Facility for violations of the Clean Water Act ("CWA").[1] Defendants

Aurora Energy Services, LLC ("Aurora Energy") and Alaska Railroad Corporation ("Alaska

Railroad") move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).[2]

Defendants have also requested a hearing.[3] Plaintiffs Alaska Community Action on Toxics and

the Alaska Chapter of the Sierra Club oppose Defendants' 12(c) motion and move to strike

various exhibits submitted by Defendants in support of it.[4] For the reasons stated below,

Plaintiffs' motion to strike is GRANTED, in part, and DENIED, in part, and Defendants' motion

---

[1]  33 U.S.C. §§ 1251-1387.

[2]  Dkt. 40.

[3]  Dkt. 46.

[4]  Dkts. 41, 42.

for judgment on the pleadings is GRANTED, in part, and DENIED, in part.  Additionally,

because oral argument would not aid the Court, Defendants' motion for a hearing is DENIED.

## I.      BACKGROUND

*A.      The CWA Citizen-Suit Provisions and NPDES Permitting Program*

Under the CWA, "any citizen may commence a civil action on his [or her] own behalf . . .

against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation

under" the Act.[5]  The term "effluent standard or limitation" is defined as including § 1311 and "a

permit or condition . . . issued under section 1342 of this title."[6]  Section 1311(a), in turn,

provides that "the discharge of any pollutant by any person shall be unlawful" except when in

compliance with, *inter alia*, § 1342.[7]  "[D]ischarges" include "any addition of any pollutant to

navigable waters from any point source."[8]  "[N]avigable waters" include "the waters of the

United States."[9]

Section 1342 establishes the "National Pollutant Discharge Elimination System"

("NPDES") under which the EPA may issue permits allowing authorized persons to discharge

pollutants.[10]  The Act also provides that states may apply to the EPA to carry out a complying

---

[5]  33 U.S.C. § 1365(a).

[6]  *Id.* § 1365(f).

[7]  *Id.* § 1311(a).

[8]  *Id.* § 1362(12); *see also id.* § 1362(16).

[9]  *Id.* § 1362(7).

[10]  *Id.* § 1342.

permitting program.[11]  The EPA delegated its permitting authority to the State of Alaska on

October 31, 2008.[12]

The "combined effect" of these provisions "is that 'the CWA prohibits the discharge of

any pollutant from a point source into navigable waters of the United States without an NPDES

permit.'"[13]

B.      *Plaintiffs' Allegations*

Plaintiffs are nonprofit organizations interested in protecting the environment and

communities from toxins and pollutants.[14]  Alaska Railroad is a public corporation established by

the state of Alaska that has owned the Seward Coal Lading Facility ("Facility") since 2003.[15]

Aurora Energy has operated the Facility since January 1, 2007, under an interim agreement with

Alaska Railroad.[16]

The Facility is located on the northwest shore of Resurrection Bay in Seward, Alaska.[17]

Alaska Railroad transports coal to the Facility via railcar from the Usibelli Coal Mine located

---

[11]  *Id.* § 1342(b).

[12]  Dkt. 1 ¶ 19.

[13]  *Northwest Envtl. Def. Ctr. v. Brown*, 617 F.3d 1176, 1181 (9th Cir. 2010) (citations omitted).

[14]  Dkt. 1 ¶¶ 7-8.

[15]  *Id.* ¶ 12.

[16]  *Id.* ¶¶ 11-12.  A subsidiary of the prior owner operated the Facility between the date that
Alaska Railroad purchased the Facility and Aurora Energy began operating it.  *Id.* ¶ 12.

[17]  *Id.* ¶ 27.

near Healy, Alaska.[18]  Defendants store coal at the Facility until it is loaded onto ships for

transport.[19]

　　　　When railcars carrying coal arrive at the Facility, they enter the "railcar dumper," where

coal is "dumped" from the railcars into a pit.[20]  A conveying system then carries the coal to a

"stacker-reclaimer" where it can be distributed into two stockpiles.[21]  The "stacker-reclaimer"

can later "reclaim" the coal from the stockpiles and distribute it onto a second conveyor that

extends over Resurrection Bay to a "ship loader" that discharges coal onto ocean-going vessels.[22]

The second conveyor (which extends over Resurrection Bay) is largely, but not entirely,

covered.[23]

　　　　Plaintiffs allege coal contaminated dust, slurry, water, and snow is discharged from the

Facility into Resurrection Bay in three ways (corresponding to their three claims).  First, it falls

from the second conveyor when coal is being transported over Resurrection Bay to the ship

loader.[24]  Second, "when the prevailing wind is from the north and is of sufficient speed, wind

transports coal dust from the stockpiles, railcar dumping facility, stacker-reclaimer, ship loader,

and conveying systems into Resurrection Bay."[25]  Third, when snow accumulates at the Facility,

---

[18] *Id.* ¶ 28.

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.* ¶ 32.

[24] *Id.* ¶¶ 35, 52.

[25] *Id.* ¶¶ 36, 61.

it becomes contaminated with coal and Defendants plow it "directly into Resurrection Bay or to nearby wetlands and ponds."[26]

The Parties agree that the Facility operates under the EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("Permit"), which became effective on September 29, 2008.[27]  Plaintiffs, however, contend that the Permit narrowly applies to "storm water discharges," and does not cover the three types of discharges at issue here.[28]

## II.    DISCUSSION

### A.    *Legal Standard*

Before addressing the merits of the Parties' motions, the Court must determine the applicable legal standard.  The standard will dictate the outcome of Plaintiffs' motion and determine what, if any, materials the Court may consider in addition to Plaintiffs' Complaint when ruling on Defendants' motion.  Defendants have submitted numerous exhibits, contending that the Court may consider them under the Rule 12(b)(1) standards, and alternatively urge the Court to convert their 12(c) motion into a motion for summary judgment pursuant to Rule 12(d).[29]  Plaintiffs suggest that Rule 12(b)(6) standards should apply to Defendants' motion,[30] and move to strike many of Defendants' exhibits.[31]  Plaintiffs also object to converting Defendants' 12(c) motion into a summary judgment motion, indicating that they will request a

---

[26]  *Id.* ¶¶ 37, 70.

[27]  *See* Dkt. 1 ¶ 20; Dkt. 41 Ex. 1.

[28]  *See* Dkt. 1 ¶¶ 20, 43, 47.

[29]  Dkt. 40 at 8-9.

[30]  Dkt. 41 at 1-2.

[31]  Dkt. 42.

continuance under Rule 56(f) (now Rule 56(d)) seeking additional time for discovery if the Court does convert it.[32]

Motions for judgment on the pleadings under Rule 12(c) are generally evaluated under the equivalent Rule 12(b) standard, depending on the basis for the motion.[33]  Here, that would be either under Rule 12(b)(1), for lack of subject matter jurisdiction, or Rule 12(b)(6), for failure to state a claim upon which relief may be granted.[34]

A jurisdictional challenge under Rule 12(b)(1) "may be factual or facial."[35]  A "facial" challenge merely attacks the allegations on the face of a pleading.[36]  In contrast, a "factual" challenge is based on materials beyond the pleadings.[37]  The general rule is that where the defendants bring a "factual" motion to dismiss for lack of subject matter jurisdiction based on extrinsic evidence, the court may look "beyond the complaint without having to convert the

---

[32]  Dkt. 47 at 2 n.1.

[33]  *See* 5C Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 1367 (3d ed. Supp. 2010) (noting that where Rule 12(h)(2) or 12(h)(3) procedural defects are raised through a Rule 12(c) motion, "presumably the district court will apply the same standards for granting the appropriate relief or denying the motion as it would have employed had the motion been brought prior to the defendant's answer under Rules 12(b)(1), (6), or (7) or under Rule 12(f)"); *see also, e.g.*, *Pacific W. Group, Inc. v. Real Time Solutions, Inc.*, 321 Fed. App'x 566, 569 (9th Cir. 2008) (citing *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989)).

[34]  *Cf.* Fed. R. Civ. P. 12(h)(2) ("Failure to state a claim upon which relief can be granted . . . may be raised . . . by a motion under Rule 12(c)"); *id.* R. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

[35]  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citation omitted).

[36]  *Id.*

[37]  *Id.*

motion to dismiss into a motion for summary judgment."[38]  These "fact"-based 12(b)(1) motions

are evaluated using summary judgment standards.[39]

       This general rule comes with one major caveat.  "[W]here the jurisdictional issue and

substantive issues are so intertwined that the question of jurisdiction is dependent on the

resolution of factual issues going to the merits, the jurisdictional determination should await a

determination of the relevant facts on either a motion going to the merits or at trial."[40]  "The

question of jurisdiction and the merits of an action are intertwined where 'a statute provides the

basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive

claim for relief.'"[41]  In those cases, "[t]he relatively expansive standards of a 12(b)(1) motion are

not appropriate."[42]  Where the merits and jurisdiction issues are intertwined, the proper course is

for the court to assume that jurisdiction exists and evaluate the motion using 12(b)(6)

---

[38] *Id.* at 1039 (citation omitted); *United States ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1200 n.2 (9th Cir. 2009) (citing *Safe Air*).

[39] *Trentacosta v. Frontier Pacific Aircraft Indus., Inc.*, 813 F.2d 1553, 1558 (9th Cir. 1987) (noting that in such cases, "the moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law") (quoting *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983)); *see also United States ex rel. Alfatooni v. Kitsap Physicians Servs.*, 163 F.3d 516, 521 (9th Cir. 1999) (noting that the court "may resolve factual disputes based on the evidence presented where the jurisdiction issue is separable from the merits of the case") (citation omitted); *cf. Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996) (noting that all factual disputes are to be resolved in favor of the non-movant).

[40] *Augustine*, 704 F.2d at 1077 (citation omitted); *see also Safe Air*, 373 F.3d at 1039.

[41] *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citation omitted).

[42] *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987).

standards.[43]  If the motion fails, the court may reassess the jurisdictional issue on the merits at the summary judgment stage or at trial.[44]

Plaintiffs move to strike many of the exhibits submitted by Defendants in support of their motion for judgment on the pleadings on Plaintiffs' Second and Third Claims, arguing that they are facial, as opposed to factual, attacks.[45]  Plaintiffs do not move to strike the Exhibits submitted by Defendants in support of their challenge to Plaintiffs' First Claim, based on the argument that the Permit authorizes the discharges from the conveying system[46] – conceding that it is a factual attack.[47]  In response, Defendants note that their arguments for dismissing Plaintiffs' First and Third Claims are both based on the Permit and assert that they are both "factual."[48]  The Court agrees with Defendants that their attacks on Plaintiffs' First and Third Claims are factual, however, both Parties fail to acknowledge that these attacks are intertwined with the merits of the dispute here.  Whether Defendants' conveyor system and snow plow discharges are covered by the Permit goes directly to the merits of the First and Third Claims because that question will determine whether Defendants' have violated "an effluent standard or limitation" under the Act.[49]

_____

[43]  *Id.* at 1177-78.

[44]  *See id.*

[45]  Dkt. 42 at 4.

[46]  *See* Dkt. 1 ¶¶ 48-57.

[47]  *See* Dkt. 42 at 3-4.

[48]  Dkt. 44 at 4-5.

[49]  *Compare* 33 U.S.C. § 1365(a)(1) (authorizing citizen suits for violations of "an effluent standard or limitation under this chapter") *with id.* § 1311(a) (indicating that "discharges" of pollutants are unlawful except where they comply with various exceptions, including the

Defendants' attack on Plaintiffs' Second Claim is not so easily categorized.  Defendants argue that various parts of the Facility do not constitute "point sources" under the CWA and that Congress did not intend for the EPA to regulate "atmospheric" coal dust discharges under the CWA.[50]  Plaintiffs correctly suggest that these are *facial* arguments that do not rely on outside evidence.[51]  Defendants also argue, however, that the Alaska Department of Environmental Conservation ("DEC") chose to regulate "windblown dust" discharges under air pollution statutes and regulations and that the Court should "defer" to DEC's decision.[52]  In doing so, Defendants rely on Exhibit O, a "Compliance Order by Consent" that they entered into with DEC as evidence of DEC's "decision."[53]  Thus, this third argument for dismissal of Plaintiffs' Second Claim is a *factual* attack relying on extrinsic evidence.  And unlike Defendants' attacks on Plaintiffs' First and Third Claims, this attack does *not* go to the merits of Plaintiffs' Second Claim.  Accordingly, the Court will evaluate it under the expansive "fact"-based 12(b)(1) standard.

---

permitting provisions); *see also Atlantic States Legal Found. v. Eastman Kodak Co.*, 12 F.3d 353, 357-58 (2d Cir. 1994) (explaining that where the parties disputed whether the permit covered various discharges, the plaintiff's "standing to bring th[e] action turn[ed] on the merits of the action itself"); *cf. Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1008 (11th Cir. 2004) ("To establish a CWA violation, the plaintiffs must prove that (1) there has been a discharge; (2) of a pollutant; (3) into waters of the United States; (4) from a point source; *(5) without a NPDES permit*.") (emphasis added).

[50]  Dkt. 40 at 18-20.

[51]  Dkt. 42 at 3.

[52]  Dkt. 40 at 21.

[53]  *See id.* (citing Ex. O).

Aside from Defendants' "deference" argument, the Court has a choice: evaluate Defendants' arguments under the Rule 12(b)(6) standard, or convert the motion into a motion for summary judgment pursuant to Rule 12(d). Rule 12(d) provides that:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.[54]

The Court does not agree that converting Defendants' motion into a motion for summary judgment is appropriate here. No discovery has taken place in this case and discovery may reveal additional information that bears on the issues raised by Defendants' motion. Accordingly, the Court will evaluate Defendants' motion under the standards applicable to a Rule 12(b)(6) motion.

When considering a motion to dismiss for failure to state a claim, courts generally assume that all allegations in the complaint are true, even if doubtful in fact.[55] A complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."[56] In order to survive a motion to dismiss, a complaint must include "[f]actual allegations [that are] enough to raise a right to relief above the speculative level."[57] In order to do so, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[58] In determining whether a complaint pleads sufficient facts to cross "the line

---

[54] Fed. R. Civ. P. 12(d).

[55] *Bell Atlantic Corp. v Twombly*, 550 U.S. 544, 555 (2007).

[56] Fed. R. Civ. P. 8(a)(1).

[57] *Twombly*, 550 U.S. at 555.

[58] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly,* 550 U.S. at 556-57).

between possibility and plausibility," courts may disregard "[t]hreadbare" legal conclusions.[59]

Then courts should determine whether the well-pleaded allegations "plausibly establish" the

claims or whether they fail in light of "more likely explanations."[60]  However, a plaintiff need

not plead "all facts necessary to carry" his or her burden.[61]  "Determining whether a complaint

states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court

to draw on its judicial experience and common sense."[62]

       B.     *Plaintiffs' Motion to Strike*

      Plaintiffs move to strike Exhibits A, B, C, D, L, M, N, and O submitted by Defendants in

support of their motion for judgment on the pleadings.[63]  As noted above, Rule 12(b)(1)

standards apply to Defendants' argument that the Court should "defer" to DEC's choice to

regulate wind-blown dust from the facility under air pollution laws and regulations.

Accordingly, the Court may consider Exhibit O, which Defendants rely on in support of that

argument.[64]

      Rule 12(b)(6) standards apply to the remainder of Defendants' arguments.  Generally, the

court should not consider materials outside of the pleadings when ruling on a motion to dismiss

---

[59]  *Id.* (citing *Twombly,* 550 U.S. at 555, 557).

[60]  *Id.* at 1949, 1951.

[61]  *Al-Kidd v. Ashcroft*, 580 F.3d 949, 977 (9th Cir. 2009), *cert. granted* __ S. Ct. __, 2010 WL 2812283 (Oct. 18, 2010).

[62]  *Iqbal*, 129 S. Ct. at 1950 (citation omitted).

[63]  Dkt. 42.

[64]  *See* Dkt. 40 at 21.

for failure to state a claim.[65]  However, there are two exceptions to this general rule.[66]  First, courts may consider materials submitted with or relied on by the complaint, even if they are not physically attached to the complaint, where their authenticity is not disputed.[67]  Second, courts may take judicial notice of matters of public record under Federal Rule of Evidence 201.[68]  This exception applies to undisputed matters of public record, as opposed to disputed facts stated in public records.[69]

Under these standards, the Court can arguably consider a number of the documents submitted by Plaintiffs.  These include the Permit, which is referenced in Plaintiffs' Complaint.[70]  The other materials submitted by Plaintiffs, consisting of information from the EPA regarding storm water permitting, may also be considered as undisputed matters of public record.[71]

The materials submitted by Defendants, however, do not appear to meet these exceptions.  (Indeed, Defendants do not suggest that they do.)  While some of the materials Defendants submitted consist of correspondence with various governmental entities obtained from Defendants' files, it is unclear whether they constitute "public records" such that the Court may take judicial notice of their content, and moreover, they appear to be disputed.  Accordingly,

---

[65]  *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).

[66]  *San Francisco Patrol Special Police Officers v. City & Cnty. of S.F.*, 13 Fed. App'x 670, 675 (9th Cir. 2001) (citing *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125-26 (9th Cir. 2002)).

[67]  *Id.* (citing *Lee*, 250 F.3d at 688).

[68]  *Id.* (citing *Lee*, 250 F.3d at 689).

[69]  *Lee*, 250 F.3d at 690.

[70]  *See* Dkt. 1 ¶ 20; Dkt. 41 Ex. 1.

[71]  Dkt. 41 Exs. 2-3.

Plaintiffs' motion to strike is GRANTED, with respect to Exhibits A through N and Exhibit P, and DENIED, with respect to Exhibit O.  Exhibits A through N and Exhibit P are accordingly struck and the Court will not consider any of those exhibits in ruling on Defendants' motion for judgment on the pleadings.

### C.    Defendants' Motion for Judgment on the Pleadings

Defendants move to dismiss Plaintiffs' three claims, contending that:  (1) Plaintiffs' First Claim based on discharges from the conveying system fails because the discharges are covered by the Permit; (2) Plaintiffs' Second Claim based on "wind-blown" discharges are barred because they cannot establish the "point source" requirement, the Act does not apply to "atmospheric" pollution, and that the Court should "defer" to DEC's decision to regulate these discharges as air pollution; and (3) that Plaintiffs' Third Claim also fails because the Permit covers their plowing of coal contaminated snow into Resurrection Bay.[72]  Defendants also move to dismiss Plaintiffs' claims to the extent that they are based on an "independent cause of action" under § 1342 and seek to recover civil penalties for days when no actual discharges occurred.[73] For the reasons discussed below, Defendants' motion is DENIED with respect to their arguments for dismissing each of Plaintiffs' claims, and GRANTED to the limited extent that Plaintiffs may not seek civil penalties for days on which no discharges occurred.

### 1.    Conveyor System Discharges (First Claim)

Defendants contend that discharges from the conveying systems are authorized by the Permit and consequently, Plaintiffs' First Claim should be dismissed.  The CWA's "Permit

---

[72]  *See* Dkt. 40 at 11-22.

[73]  *Id.* at 23-24.

13

Shield Defense" provision provides that "[c]ompliance with a permit issued pursuant to this section shall be deemed compliance" with various aspects of the Act, including the provisions prohibiting discharges and authorizing citizen-suits.[74]  The question of whether the Permit Shield Defense applies will necessarily depend on the scope of the Permit.  In general, a permit may be interpreted in the same manner that a court would interpret a contract or other legal document.[75]

The Fourth Circuit's decision in *Piney Run Pres. Assoc. v. County Comm'rs*,[76] is the seminal decision on the scope of the Permit Shield Defense.   In *Piney Run*, the Fourth Circuit applied the Supreme Court's *Chevron* analysis and found that the language of the Permit Shield Defense was ambiguous.[77]  In the second step of the analysis, the court determined that the EPA's Environmental Appeals Board had already reasonably interpreted the provision to apply to "pollutants that are not listed in [the] permit as long as [the party] only discharges pollutants that have been adequately disclosed to the permitting authority."[78]  Accordingly, the Permit Shield Defense applies to "discharges [that are] reasonably anticipated by, or within the reasonable contemplation of the permitting authority."[79]  In other words, "all discharges

---

[74]  33 U.S.C. § 1342(k).

[75]  *Northwest Envtl. Advocates v. City of Portland*, 56 F.3d 979, 982 (9th Cir. 1995).

[76]  268 F.3d 255 (4th Cir. 2001).

[77]  *Id.* at 267 (citing *Atlantic States Legal Found. v. Eastman Kodak Co.*, 12 F.3d 353, 357-58 (2d Cir. 1994)).

[78]  *Id.* at 267-68 (citing *In re Ketchikan Pulp Co.*, 7 E.A.D. 605, 1998 WL 284964 (EAB 1998)).

[79]  *Id.* at 268-69.

adequately disclosed to the permitting authority are within the scope of the permit's protection."[80]

Here, the Permit, itself, is a general permit that does not specifically address what discharges it applies to at Defendants' Facility.[81]  Additionally, because the Court cannot consider the extrinsic evidence submitted by Defendants' in support of their argument, it has no basis for determining what Defendants and their predecessors disclosed to the permitting authorities.  Accordingly, the Court cannot find, at this stage, that the Permit authorizes the conveying system discharges.

Defendants also argue that Plaintiffs' claim is barred because the Plaintiffs failed to challenge the EPA's issuance of the Permit as provided under the EPA regulations and the Act.[82] To the extent that the Permit does cover the discharges at issue here, Defendants may have a valid argument.  However, the Court cannot make that predicate determination on this record.  At this stage, Plaintiffs have sufficiently alleged their First Claim related to the conveying system discharges.

### 2.    Wind-Blown Discharges (Second Claim)

Defendants provide three bases for arguing that Plaintiffs' Second Claim is not actionable under the CWA.  First, Defendants argue that the alleged wind-blown discharges are not being

---

[80]  *Id.*

[81]  *See* Dkt. 40 Ex. 1.

[82]  *See Amigos Bravos v. Molycorp, Inc.*, 166 F.3d 1220, 1998 WL 792159, at *2-4 (10th Cir. 1998) (discussing the permitting process and affirming district court's dismissal for lack of subject matter jurisdiction where the EPA had considered the discharges at issue when renewing defendant's permit); *see also* 33 U.S.C. § 1369(b)(1) (providing for review of certain agency decisions, including those "in issuing or denying any permit under section 1342," in the Circuit Court of Appeals within 120 days of the issuance or denial).

channeled from a "point source," as required under the Act.[83]  Second, Defendants contend that the Act does not apply to "atmospheric deposition resulting from windblown dust."[84]  Third, Defendants assert that the Court should defer to DEC's decision to regulate coal dust discharges at Defendants' Facility as air pollution.[85]

*a)     Point Sources*

Plaintiffs allege that coal dust emitting from the coal stockpiles, railcar dumping facility, stacker-reclaimer, ship loader, and conveyor systems at the Facility is blown by the wind into Resurrection Bay and accordingly that these components constitute "point sources" under the CWA.[86]  Defendants argue that Plaintiffs cannot establish the "point source" requirement because coal dust carried from various parts of the Facility by wind to Resurrection Bay is not "channelized" and therefore, cannot constitute a "point source."[87]

The Act defines "point source" broadly.[88]  It states that a "point source" is:

> any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.[89]

---

[83]  Dkt. 40 at 18-20.

[84]  *Id.* at 20-21

[85]  *Id.* at 21.

[86]  Dkt. 1 ¶¶ 61-63.

[87]  Dkt. 40 at 18-20.

[88]  *See United States v. Earth Sciences, Inc.*, 599 F.2d 368, 373 (10th Cir. 1979) ("The concept of a point source was designed to further [the NPDES permitting] scheme by embracing the broadest possible definition of any identifiable conveyance from which pollutants might enter the waters of the United States.").

[89]  33 U.S.C. § 1362(14).

16

Thus, "point source" pollution is typically thought to result from "confined," "discrete," or "discernible" conveyances.[90]  In contrast, "nonpoint source" pollution, while not statutorily defined, "is widely understood to be the type of pollution that arises from many dispersed activities over large areas, and is not traceable to any single discrete source."[91]  The main purpose of the "point source"/"nonpoint source" distinction is to distinguish between identifiable and unidentifiable sources.[92]

"The most common example of nonpoint source pollution is the residue left on roadways by automobiles."[93]  Precipitation washes residue resulting from thousands of cars traveling on the roadways into "creeks, rivers, bays, and the ocean," but such a "discharge" is not from a "point source" because it "arises from many dispersed activities over large areas, and is not traceable to any single discrete source." [94]  Nonpoint source pollution is typically associated with

---

[90]  *Trustees for Alaska v. EPA*, 749 F.2d 549, 558 (9th Cir. 1984).

[91]  *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1184 (9th Cir. 2002).

[92]  *Earth Sciences,* 599 F.2d at 373 (determining that "Congress would have regulated so-called nonpoint source sources if a workable method could have been derived" and finding that "it contravenes the intent of the [CWA] and structure of the statute to exempt from regulation any activity that emits pollution from an identifiable point").

[93]  *Forsgren*, 309 F.3d at 1184.

[94]  *Id.*

runoff,[95] although the mere fact that some form of precipitation is involved in the pollution does not preclude the possibility that the pollution may result from a "point source."[96]

Defendants rely primarily on *Cordiano v. Metacon Gun Club, Inc.*[97] In that case, the Second Circuit held that runoff must be "collected or channeled by human beings" in order to constitute "point source" pollution.[98] The Second Circuit reached this conclusion after applying *Chevron*.[99] It found that Congress had not determined "when surface runoff can constitute a point source discharge" and thus found that the EPA's "channelization" requirement was entitled to deference.[100] It suggested that otherwise, every discharge involving a human, such as a person throwing a candy wrapper into the Hudson River, could potentially constitute a "discharge" from a "point source."[101]

Other courts have noted that collected materials can constitute a point source even if natural means convey the pollutants into navigable waters where the act of collecting or channeling the materials in a given place makes it "reasonably likely" that natural means will

---

[95] *See, e.g., Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 220 (2d Cir. 2009) (collecting authority).

[96] *See Northwest Envtl. Def. Ctr. v. Brown*, 617 F.3d 1176, 1182 (9th Cir. 2010); *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th Cir. 1979).

[97] Dkt. 40 at 18-19 (discussing 575 F.3d 199, 224 (2d Cir. 2009)).

[98] *Cordiano*, 575 F.3d at 221.

[99] *Id.*

[100] *Id.* at 221-22 (emphasis omitted).

[101] *Id.* at 219.

deposit pollutants from the source "into a navigable body of water."[102]  Thus, a pile of excess

rock material created by mining activities susceptible to erosion by natural forces can be a "point

source."[103]  Similarly, the Second Circuit, itself, has found that an apparatus spraying pesticides

into the air over a waterway can be a "point source" because "[t]he pesticides were discharged

'from' the source, and not from the air."[104]  That court further indicated that "[t]he word 'from'

is defined 'to indicate a starting point,' and also denotes the 'source or original or moving force

of something.'"[105]

     Here, even under a strict application of the Second Circuit's *Cordiano* analysis,[106]

Plaintiffs' allegations are sufficient to state a claim.  In *Cordiano*, the plaintiffs were a group of

homeowners who sued the defendants, the owners and members of a gun club that operated a

---

[102]  *Environmental Protection Info. Ctr. v. Pacific Lumber Co.*, 469 F. Supp. 2d 803, 821 (N.D. Cal. 2007) (quoting *Sierra Club v. Abston Constr. Co.*, 620 F.2d 41, 45 (5th Cir. 1980)).

[103]  *Abston Constr.*, 620 F.2d at 45.  *Accord Stone v. Naperville Park Dist.*, 38 F. Supp. 2d 651, 655-56 (N.D. Ill. 1999) (various parts of shooting range facility constituted "point sources" because they channeled airborne lead shot to the water); *Friends of Santa Fe Cty. v. LAC Minerals, Inc.*, 892 F. Supp. 1333, 1337-38, 1352-53, 1359 (D.N.M. 1995) (recognizing that a mining waste pile was a "point source" because exposure to air and water created acid mine drainage).

[104]  *Peconic Baykeeper, Inc. v. Suffolk Cty.*, 600 F.3d 180, 188-89 (2d Cir. 2010) (citation omitted).

[105]  *Id.*

[106]  It is not clear whether the Ninth Circuit would agree with the Second Circuit's analysis in *Cordiano*.  It has previously found that the definition of "point source" was *not* ambiguous in the context of determining whether airplanes spraying pesticides could be considered "point sources."  *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1185-86 (9th Cir. 2002) (applying *Chevron*); *see also Northwest Envtl. Def. Ctr. v. Brown*, 617 F.3d 1176, 1182 (9th Cir. 2010) (indicating that the statutory definition of "point source" is clear and unambiguously expresses Congress' intent).

shooting range at its site.[107]  The plaintiffs alleged that the defendants were discharging lead

munitions in violation of the CWA.[108]  The plaintiffs alleged that an earthen berm used for bullet

containment constituted a "point source."[109] The district court had granted the defendants'

motion for summary judgment.[110]  On appeal, the Second Circuit affirmed, repeatedly finding

that the plaintiffs had failed to produce evidence that runoff or airborne dust carrying lead from

the berm was being channeled to wetlands.[111]  The court noted that it was not finding "that a

berm can never constitute a point source, but only that there is *insufficient evidence* that the

migration of lead from [the] berm by virtue of runoff and airborne dust is a point source

discharge."[112]

 Here, the Plaintiffs have alleged that Defendants collect coal in various places in the

Facility, and that as a result of Defendants' activities, wind carries airborne coal dust into

Resurrection Bay.[113]  An exhibit to Plaintiffs' Complaint also includes a number of photographs

allegedly showing wind-blown coal dust being generated at various places in the Facility and in

Resurrection Bay.[114]  Although these allegations do not definitively establish that the stockpiles,

dumping facility, stacker-reclaimer, ship loader, and conveyor systems are "point sources,"

---

[107]  *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 202 (2d Cir. 2009).

[108]  *Id.*

[109]  *Id.* at 202, 218.

[110]  *Id.* at 202.

[111]  *Id.* at 222-24.

[112]  *Id.* at 224 (emphasis added).

[113]  *See* Dkt. 1 ¶¶ 61-63.

[114]  *See* Dkt. 1-2 at 8-14.

Plaintiffs do not need to prove or even establish that their claims are probable at the pleading stage. Their allegations plausibly suggest that the coal dust is "reasonably likely" to wind up in Resurrection Bay as a result of Defendants' collecting and channeling coal at the stockpiles, dumping facility, stacker-reclaimer, ship loader, and conveyor systems. Accordingly, Plaintiffs' Second Claim is sufficient to survive the pleading stage in this respect.

> b)      *Application of the CWA to "Atmospheric" Discharges*

Defendants also argue that the CWA cannot apply to wind-blown discharges because Congress intended to regulate "atmospheric deposition of windblown dust" through the Clean Air Act, not the CWA.[115] While facially appealing, this argument is easily disposed of at the pleading stage.

If Plaintiffs were alleging that Defendants were discharging coal into the air, and that were the end of the matter, Defendants might have a compelling argument. But that is not what Plaintiffs are alleging. Indeed, that is the purpose of the CWA requirement that Plaintiffs assert that the discharge occur into "navigable waters."[116]

Congress's primary purpose in enacting the CWA was quite obviously to regulate water pollution.[117] Plaintiffs allege here that activities at Defendants' Facility result in water pollution in violation of the CWA. Merely because the pollution has traveled some yet to be determined

---

[115]  *See* Dkt. 40 at 20-21; Dkt. 45 at 9.

[116]  33 U.S.C. § 1362(12) (defining "discharge of a pollutant" and "discharges of pollutants" as including discharges from a point source into navigable waters). Indeed, in *Cordiano*, relied on by Defendants, the Second Circuit appeared to recognize that a discharge may occur through "airborne dust." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 224 (2d Cir. 2009).

[117]  *See, e.g.*, *Trustees for Alaska v. EPA*, 749 F.2d 549, 553 (9th Cir. 1984).

distance through the air does not render it "atmospheric" and remove it from the realm of the CWA.[118]

Plaintiffs allege, *inter alia*, that the Defendants' conveying system carries coal out above Resurrection Bay, and some coal dust is carried through the air into the Bay from that system. Those discharges can be "reasonably expected" based on the fact that the conveyor extends over the water.  Discharges from other parts of Defendants' Facility may also be "reasonably expected" due to their close proximity to Resurrection Bay.  Plaintiffs may eventually be able to demonstrate that these discharges are not properly within the scope of the CWA, but at this point, the Court cannot agree that the mere fact that the pollutants travel some distance through the air defeats CWA liability *per se*.

c)      *DEC's Decision to Regulate Coal Dust as Air Pollution*

Defendants also argue that Plaintiffs' claim cannot proceed because DEC has chosen to regulate airborne dust discharges at the Facility under air pollution statutes and regulations.[119] Relying on *Couer Alaska, Inc. v. Southeast Alaska Conservation Council*,[120] Defendants assert that, "[t]he Supreme Court has instructed that where agencies make a reasonable interpretation of responsibilities and jurisdiction under a statute, the court should defer to that decision."[121]

---

[118]  *Cf. No Spray Coalition, Inc. v. City of New York*, No. 00 Civ. 5395(GBD), 2005 WL 1354041, at *4 (S.D.N.Y. June 8, 2005) (noting that "it would be unreasonable to distinguish between a sprayer releasing a fine mist pollutant into the atmosphere over the water and a pipe that released the same single flow of pollutant directly into water").

[119]  Dkt. 40 at 21.

[120]  129 S. Ct. 2458 (2009).

[121]  Dkt. 40 at 21.

In *Couer Alaska*, an environmental group challenged a plan by a mining company to dispose of "fill material" in a lake.[122]   The company's plan had been approved by the Army Corps of Engineers pursuant to its permitting authority to authorize discharges of "dredged or fill material" under CWA § 1344.[123]   The group argued that the company should have obtained a permit under § 1342 from the EPA, not from the Army Corps of Engineers under § 1344.[124]   The group cited a regulation issued by the EPA which indicated that "[d]ischarges of dredged or fill material into waters of the United States which are regulated under" § 1344 "do not require" § 1342 permits from the EPA.[125]   The group argued the regulation indicated that only a subset of fill material discharges were regulated under § 1344 because there was no comma after the word "which."[126]   The Court rejected the group's argument, accepting the EPA's contrary interpretation of the regulation because it was "not 'plainly erroneous or inconsistent with the regulation.'"[127]

Defendants' argument relies on Exhibit O, a "Compliance Order by Consent" entered into between Defendants and DEC.[128]   That Exhibit indicates that DEC began investigating

---

[122]   129 S. Ct. at 2463-64.

[123]   *Id.*

[124]   *Id.* at 2466.

[125]   *Id.* at 2467-68 (quoting 40 C.F.R. § 122.3).

[126]   *Id.* at 2468.

[127]   *Id.* (citation omitted).   The other case relied on by Defendants stands for a similar proposition.  *See Fairhurst v. Hagener*, 422 F.3d 1146, 1150 (9th Cir. 2005) (indicating that courts should defer to an agency's "construction of a statute that it is charged with enforcing" so long as that construction is "reasonable and not in conflict with the intent of Congress").

[128]   *See* Dkt. 40 Ex. O.

23

Defendants' activities based on "approximately twenty-five public complaints and about seventy-five photographs purporting to show coal dust being emitted into ambient air from coal terminal operations and being deposited on adjacent properties, vessels in the adjacent marina, and Resurrection Bay."[129]  It further states that from its investigation, DEC determined that Defendants "violated Alaska's Air Quality Control regulations."[130]

Exhibit O, however, does not demonstrate that DEC determined that airborne coal dust blown by wind from Defendants' Facility to Resurrection Bay should be regulated under air pollution standards rather than by the CWA.  Indeed, given that DEC was concerned with complaints that the airborne dust had been deposited in many places in the area (some of which were not "navigable waters"), the decision to address the issue under the air pollution regulations, as opposed to the CWA (which would only impact Resurrection Bay), is not inconsistent with Plaintiffs' Second Claim.[131]  At this time, Defendants have not established that the material jurisdictional facts are not in dispute, and accordingly, their argument that the Court must "defer" to DEC's "decision" fails.[132]

---

[129]  *Id.* at 7.

[130]  *Id.* at 7-8 (citing Alaska Admin. Code tit. 18, §§ 50.045(d), 50.110).

[131]  Moreover, DEC's inspection report indicates that it "did not observe any coal dust on the surface of the water" during its inspection, which would make any attempt to regulate the dust under the CWA somewhat tenuous.  *Id.* at 44.

[132]  Additionally, to the extent that Defendants are suggesting that Plaintiffs' claim is barred under 33 U.S.C. § 1319(g)(6)(A)(iii), which they do not cite, the Court finds that on this record, they have not established the required elements of that defense.

24

3.       *Snow Plow Discharges (Third Claim)*

In their Third Claim, Plaintiffs allege that Defendants plow coal contaminated snow directly into Resurrection Bay and adjacent wetlands and ponds.[133]   Defendants argue that the Permit authorizes the snow plow discharges, relying on documents disclosed to the permitting authorities.[134]   However, as previously discussed, the Court cannot consider those materials at this stage of the litigation.   Plaintiffs' Third Claim is otherwise sufficient to state a claim upon which relief may be granted.

4.       *Plaintiffs' Claims for Failure to Obtain a Permit*

In their Complaint, Plaintiffs appear to allege that the Defendants are violating § 1342 "every day" that they "do not have an NPDES permit for the discharges," regardless of whether or not an actual discharge occurred on each of those days.[135]

Defendants move to dismiss Plaintiffs' claims to the extent that they are based on an independent cause of action under the permitting provision, § 1342, as opposed to the citizen-suit provisions.[136]   Defendants rely on the Northern District of California's decision in *Environmental Protection Information Center v. Pacific Lumber Co.*[137]   There, the court explained that there is no "separate cause of action" under § 1342, rather claims for discharges

---

[133]   Dkt. 1 ¶ 70.

[134]   Dkt. 40 at 21-22.

[135]   *See id.* ¶¶ 55-56 64-65, 74.   Plaintiffs also allege that "at least 1,826" violations occurred between October 28, 2004, and the day the Complaint was filed, December 28, 2009.   *See id.* This amounts to almost one violation per day.   However, it does not appear that Plaintiffs' can plausibly suggest that actual discharges occur each day – e.g., it is obvious that Defendants did not plow coal contaminated snow into Resurrection Bay every day since October 28, 2004.

[136]   Dkt. 40 at 15.

[137]   469 F. Supp. 2d 803 (N.D. Cal. 2007).

are "appropriately brought under" § 1311.[138]  That court also explained that there can be no

citizen-suit claim for failure to obtain a permit absent a discharge of a pollutant to navigable

waters from a point source.[139]

In their opposition, Plaintiffs indicate that Defendants have "mischaracterize[d]" their

claims, and clarify that they are alleging violations of § 1311(a), "which incorporates" § 1342.[140]

Plaintiffs are correct in this respect.  Lack of an applicable § 1342 permit is an element of a claim

under the citizen-suit provisions.[141]

That does not mean, however, that Plaintiffs may claim violations of the Act for each day

that the Defendants failed to obtain an applicable permit.  Plaintiffs argue that their claims are

based on "*actual* unpermitted discharges that are likely to reoccur in the future" but also contend

that "not having a permit is a violation" of the citizen-suit provisions.[142]  Defendants correctly

note that the authority Plaintiffs rely on concerns the manner that a plaintiff may prove an

"ongoing violation," which is a separate subject-matter jurisdiction requirement for a citizen-

suit,[143] and not the number of violations for the purposes of determining civil penalties.[144]

---

[138]  *Id.* at 827.

[139]  *Id.* at 826-27 (citing *Waterkeeper Alliance, Inc. v. United States EPA*, 399 F.3d 486, 505 (2d Cir. 2005)).

[140]  Dkt. 41 at 24.

[141]  *See Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1008 (11th Cir. 2004) ("To establish a CWA violation, the plaintiffs must prove that (1) there has been a discharge; (2) of a pollutant; (3) into waters of the United States; (4) from a point source; *(5) without a NPDES permit*.") (emphasis added).

[142]  Dkt. 41 at 24 (emphasis original).

[143]  *See Gwaltney of Smithfield Ltd., v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57-59 (1987) (interpreting 33 U.S.C. § 1365 to permit citizens to bring suit only for an "ongoing," "continuous," or "intermittent" violation).  A violation is "ongoing" where there is a "reasonable

The Court agrees with Defendants that any civil penalties must be based on actual discharges, and not the mere failure to obtain a permit. Plaintiffs may be able to establish that penalties are appropriate based on intermittent discharges. But lack of a permit is not, in and of itself, a violation absent a discharge of a pollutant. Accordingly, Defendants' motion for judgment on the pleadings is GRANTED to the limited extent that the Court agrees that any civil penalties under § 1319(d) should be calculated only with respect to days involving actual discharges of pollutants.

### III.    CONCLUSION

Defendants' arguments may well prevail on summary judgment but, at this early stage, the Court finds that Plaintiffs have – with one caveat – adequately stated their claims. Accordingly, for the foregoing reasons, the Court GRANTS, in part, and DENIES, in part, Plaintiffs' motion to strike (Docket No. 42), GRANTS, in part, and DENIES, in part, Defendants' motion for judgment on the pleadings (Docket No. 40), and DENIES Defendants' motion for a hearing (Docket No. 46).

Dated at Anchorage, Alaska, this 10th day of January, 2011.

/s/ Timothy M. Burgess
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE

---

likelihood that a past polluter will continue to pollute in the future" – not necessarily that the polluter will pollute every day. *See id.* at 57. The Court does not understand Defendants to suggest that the Court lacks subject-matter jurisdiction over Plaintiffs' claims because the "ongoing violation" requirement is not satisfied here.

[144] *Compare Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1061 (5th Cir. 1991) (discussing the subject-matter jurisdiction requirements under the Supreme Court's decision in *Gwaltney*), *and Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.*, 890 F.2d 690, 693 (4th Cir. 1989) (similar), *with* 33 U.S.C. § 1319(d) (providing that violators of § 1311 "shall be subject to a civil penalty not to exceed $25,000 *per day* for each violation") (emphasis added).